**Stuart SCHERR and Steven Goodman,**
**Plaintiffs,**

v.

**UNIVERSAL MATCH CORPORATION**
**and United States of America,**
**Defendants.**

**No. 64 Civ. 3377.**

United States District Court
S. D. New York.

Sept. 18, 1967.

---

2.  All purchases are made via the warehouse or commissary.

Bernard Olcott, New York City, for plaintiffs; Herbert Kanon, New York City, of counsel.

Cabell, Medinger, Forsyth & Decker, New York City, for defendant Universal. Match Corp.; Edwin J. Jacob, Jon H. Hammer, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty. for Southern District of New York, for defendant United States of America; Robert E. Kushner, Asst. U. S. Atty., of counsel.

McGOHEY, District Judge.

The defendants in this copyright infringement action moved for summary judgment dismissing the complaint on the ground that the subject matter, a statue made at Government expense by soldiers assigned to do so while on active military duty, is a publication of the United States Government and thus is not copyrightable;[1] and that in any event the claimed copyright is invalid for failure of the plaintiffs to affix an adequate notice of copyright to the statue.[2] The latter depicts a charging infantryman in battle dress and is entitled "The Ultimate Weapon."

The action arises from defendant Universal's production and distribution, with the authorization of the Army, of books of matches bearing on the cover a picture of the statue and the legend: "Home of The Ultimate Weapon Fort Dix N. J." The United States (the Government), not originally named as a defendant, intervened. It asks, additionally, that if the copyright is held valid, it be ordered assigned to the Government as an employer under the "works for hire" rule.[3]

The court finds there is no genuine issue as to any material fact. Summary judgment in favor of the defendants is granted to the extent and for the reasons hereafter stated.

The plaintiffs are two ex-servicemen. Goodman served in the Army from April

1. 17 U.S.C. § 8.
2. 17 U.S.C. § 19.
3. 17 U.S.C. § 26.

1957 to April 1959; Scherr from October 1957 to October 1959. Both men, prior to induction, had had education and experience in the fine arts. They were assigned as illustrators to Headquarters Company at Fort Dix, New Jersey, where their duties included the preparation of visual training aids. During his free time, Goodman, using supplies given him by the post hobby shop, began to make a small model of an infantryman which was brought to the attention of the deputy post commander. The latter expressed interest in having constructed a larger statute of an infantryman which would serve as a symbol of Fort Dix. After some preliminary research as to the feasibility of such a project it was agreed that Goodman and Scherr would undertake it. Both men were thereupon relieved of their regular duties as illustrators and they set about to create the proposed statue. With the exception of a few "KP" details and barracks inspections, the plaintiffs devoted all of their regular duty hours, and some of their free time, to the work for a period of nine months.

In the design stage, the plaintiffs used other servicemen, assigned by the Army, as models and photographs of these men taken by Government furnished photographers. The first step in the actual construction of the statue was the making of an "armature" out of scrap metal obtained from various "dumps" located on the base. Sculpt-Metal,[4] which was then applied to the armature, was molded to form the figure of a charging infantryman in battle dress and equipment. The body above the waist is bent forward and on the back, just over the belt, is a field pack. This is boxlike in shape and appears to hang from suspenders which also support a belt. Its front and back panels are of equal size and almost square in dimension. Narrower panels joining the front and back form the other four sides of the box. The completed figure was sprayed with numerous alternate coats of bronze finish and clear lacquer. Most of this work was done in the heavy equipment section of the post engineers' shop at Fort Dix.

The plaintiffs were assisted by two other servicemen who, in addition to the models, had been assigned as part of their regular duty to work on the project.[5] Furthermore, all heavy equipment and the operators therefor, plus masons, carpenters, blacksmiths and machinists were supplied by the Army. The plaintiffs' only out-of-pocket expenses, estimated to be less than $25 each, were for tools and books. Goodman's car was also used for various errands around the base. The total estimated cost to the Army was more than $12,000.[6] During the course of the project the plaintiffs prepared and submitted progress reports to their superiors. Although the plaintiffs had complete freedom in the design, at one point the officer in charge of the project, noting what he deemed a similarity between Goodman's face and that on the statue, ordered the latter to be changed, which was done. The statue was unveiled on March 20, 1959, and remains on display at Infantry Park,

---

4. Sculpt-Metal is a material which can be applied directly to the armature and molded before it hardens, thus saving the time and expense of casting the statue. Goodman had previously worked with this material [Deposition, p. 19], although Scherr had not [Deposition, p. 60]. During the research phase of the project, both men went to Pittsburgh where they were given technical information and instruction regarding the use of Sculpt-Metal. For this trip, plaintiffs were given the use of a Government truck, and while in Pittsburgh they were billeted overnight at a missile base.

When they returned to Fort Dix they were reimbursed for whatever expenses they had incurred.

5. Plaintiffs were also assisted by soldiers from the stockade. Goodman Deposition, p. 41.

6. During the course of the project, Scherr kept a diary [U.S.A. ex. 1 id.]. The Army's estimated total cost, $12,367.90, was based in part on the entries in this diary. The Army estimate [U.S.A. ex. 8 id.] was conceded by Scherr to be "basically accurate." Scherr Deposition, p. 71.

Fort Dix, a site selected by the Army. The title of the statue was also selected by the Army. The claim of copyright in the names of plaintiffs was registered [7] in June 1959, approximately three months after the unveiling.

The defendants' primary contention is that the statue is a publication of the Government within the meaning of 17 U.S.C. section 8 and is, therefore, not copyrightable. That section provides in pertinent part: "No copyright shall subsist * * * in any publication of the United States Government, or in any reprint, in whole or in part, thereof * * *." The precise scope of the phrase "publication of the United States Government," has long been a source of conflict and concern, as a result of which many definitions and criteria have been suggested for categorizing various works as within or without the prohibition of the section.[8] The issue presented by this motion does not, however, fall within the ambit of this confusion, since in all discussions of the problem there seems to be unanimous, albeit tacit, agreement that "publications of the United States Government" refers to printed works.[9] This conclusion is given added weight by the correspondence of language used to circumscribe the prohibitions found in the Copyright Act and in the Printing Law;[10] and is further buttressed by the fundamental purpose underlying the prohibition which is based on "the necessity of wide public dissemination of the contents of materials produced by and relating to issues and problems of national interest * * * [which] policy is unquestionably a desirable one in a democracy, much of whose success is dependent on a well-informed public."[11] The statue in ques-

---

7. 17 U.S.C. § 11.

8. See, e. g., Berger, Copyright in Government Publications, Study No. 33, in Copyright Law Revision, Report of the Register of Copyrights and Studies Nos. 1–34 (1961); Howell, Copyright Law 47 (rev. ed. 1962); Nimmer, Copyright § 66 (1964); 12 ASCAP Copyright Law Symposium 96 (1961); 11 ASCAP Copyright Law Symposium 138 (1960); 8 ASCAP Copyright Law Symposium 3 (1957); Comment, 17 Rutgers L.Rev. 579 (1963). Berger, supra at 30 notes: "The confusion may be traceable to the dual meaning of the word 'publication'; it may refer to the act of reproducing and distributing copies (printing and distribution by the Government), or it may refer to the work that is being published (a work produced by the Government, i. e., produced for the Government by its employees)."

9. Berger, supra note 8 at 35–36 ["In addition to the private use of Government publications for advertising purposes, instances have occurred in which Government publications have been reproduced and sold at high prices without indicating their origin as Government *documents* * * *." (Emphasis added.)]; Comment, 17 Rutgers L.Rev. 579 at 581 (1960) [The problem is to find criteria for determining "what makes a particular *writing* a Government publication."

(Emphasis added.)]. See also, Howell, supra note 8 at 47; Nimmer, supra note 8 at 267.

10. See Public Affairs Associates, Inc. v. Rickover, 109 U.S.App.D.C. 128, 284 F. 2d 262, 268 (1960), vacated and remanded, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962). Compare 17 U.S.C. § 8 with 44 U.S.C. § 58. See Berger, supra note 8 at 29–33.

11. 12 ASCAP Copyright Law Symposium 96 at 105 (1961). Among the other reasons for the prohibition "there is the feeling that if a *literary* product was produced at public expense by a government employee it should be freely available to the public, and the author should not be allowed to impede its free circulation by securing a copyright thereon * * *." Id. (Emphasis added.) Also, there is "the feeling that the public at large is entitled to make whatever use it desires of materials and publications produced at government expense, inasmuch as the Government is supported by the people. Apparently, Congress felt that this interest of the public outweighs any need to prevent possible abuses which may occur through distortion, misquotation or excessive pricing of government materials which are privately reproduced." 11 ASCAP Copyright Law Symposium 138 at 141 (1960).

tion, it is concluded, is not a "publication of the United States Government" within the meaning of 17 U.S.C. § 8.

The defendants next contend that the copyright notice is inadequate, that the claimed copyright is thus invalid and that "The Ultimate Weapon" is, therefore, in the public domain.[12] The statue is twelve feet tall and stands on a pile of rocks about three feet high which, in turn, stands on a base about twelve feet high. Affixed to this base are two plaques, one of which bears the legend: "The Ultimate Weapon—The only indispensable instrument of war—The fighting man." The smaller plaque bears the names of plaintiffs and of the two men who assisted them. Plaintiffs did not affix their notice of copyright to this base, either as part of one of the plaques or separately, because they feared the repercussions, real or imagined, of the Army. Before the unveiling, the statute, without the pack, was taken from the engineers' shop and placed in position on its base. Scherr, unknown to his superiors, then placed a notice of copyright in proper form to the uppermost panel of the pack which he then attached firmly to the back of the soldier. The notice is located close to that back and about twenty-two feet from the ground. It is impossible for anyone standing on the ground to see the notice. In order to do so, one would have to get astride the back of the figure or, in some manner, get positioned above it.[13]

Section 10 of the Copyright Act provides: "Any person entitled thereto by this title may secure copyright for his work by publication thereof with the notice of copyright required by this title * * *." Section 19 of the Act provides, with respect to *copies* of works of art, that "The notice of copyright required by section 10 * * * may consist of the letter C enclosed within a circle * * * accompanied by the initials, monogram, mark or symbol of the copyright proprietor; *Provided,* That on some accessible portion of such copies or of the margin, back, permanent base, or pedestal, or of the substance on which such copies shall be mounted, his name shall appear." Defendants do not contend that any of the requisite contents of the notice are missing,[14] but rather that the notice is inadequate because it is improperly placed.

■■■ The present Act is silent as to where the notice should appear on works of art.[15] However, the unquestioned purpose of the notice requirement is "to apprise anyone seeking to copy the article, of the existence of the copyright * * *."[16] This purpose was clearly frustrated by plaintiffs who, in their own words, sought to make the notice as inconspicuous as possible,[17] an objective they achieved with singular success. Furthermore, although the Certificate of Registration obtained by plaintiffs is prima facie evidence of the validity of the copyright,[18] the de-

---

12. Gray v. Eskimo Pie Corp., 244 F.Supp. 785, 788 (D.Del.1965).

13. Goodman Deposition, pp. 59–60; Scherr Deposition, p. 110.

14. The notice affixed by plaintiffs contains a letter C enclosed within a circle; the names Stuart Scherr and Steven Goodman; and the date, 1959.

15. For a thorough discussion of the prior law, see Coventry Ware, Inc. v. Reliance Picture Frame Co., 288 F.2d 193 (2d Cir.), cert. denied, 368 U.S. 818, 82 S.Ct. 34, 7 L.Ed.2d 24 (1961). See also, Nimmer supra note 8 at § 87.6 to the effect that where the location of the notice is not prescribed it may be placed anywhere so long as it gives reasonable notice of the claim of copyright.

16. Coventry Ware, Inc. v. Reliance Picture Frame Co., supra note 15 at 195, citing Trifari, Krussman & Fishel, Inc. v. Charel Co., 134 F.Supp. 551, 554 (S.D.N.Y. 1955). See also Ted Arnold Ltd. v. Silvercraft, Inc., 259 F.Supp. 733 (S.D. N.Y.1966); Dan Kasoff, Inc. v. Gresco Jewelry Co., 204 F.Supp. 694 (S.D.N.Y.), aff'd per curiam, 308 F.2d 806 (2d Cir. 1962).

17. Goodman Deposition, p. 50; Scherr Deposition, p. 109. Additionally, Scherr, when questioned by a JAC officer, stated that he had no copyright.

18. Flick-Reedy Corp. v. Hydro-Line Mfg. Co., 351 F.2d 546 (7th Cir.), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.

fendants have rebutted this presumption by showing that the notice did not fulfill the statutory purpose—a purpose which plaintiffs had no intention of fulfilling. Since its unveiling, "The Ultimate Weapon" has at all times been, and is today, on view at Infantry Park, a site open to the public. During this time there has never been any restriction, posted or otherwise, on the copying or photographing of the statue.[19] Because the statue was displayed without restriction as to either persons or purpose [20] and without adequate notice, it is concluded that there was a divestive publication under an invalid copyright such as to place "The Ultimate Weapon" in the public domain.[21]

However, even if the copyright notice were valid the plaintiffs would not be entitled to any of the benefits of the copyright protection because, as the defendants contend, the statue falls within the "works for hire" rule of 17 U.S.C. § 26 and, therefore, any and all copyright interest in the statue belongs to, or inures to the benefit of, the Government.[22]

Various criteria have been suggested for determining whether a given work was made for hire, among these being whether the work was produced within the "scope of employment," and, whether the work was produced on the employer's time and using the employer's facilities.[23]

2d 301 (1965) ; Manes Fabric Co. v. Miss Celebrity, Inc., 246 F.Supp. 975 (S.D. N.Y.1965).

19. Affidavit of James L. R. Ward, a Civilian Special Services Officer who has been employed at Fort Dix continuously since 1955.

20. Continental Cas. Co. v. Beardsley, 253 F.2d 702, 706–707 (2d Cir.), cert. denied, 358 U.S. 816, 79 S.Ct. 25, 3 L.Ed.2d 58 (1958).

21. Ball, Copyright and Literary Property § 62 (1944); Cary, The Quiet Revolution in Copyright, 35 Geo.Wash.L.Rev. 652, 659–60 (1967). Compare Carns v. Keefe Bros., 242 F. 745 (D.Mont.1917) with Werckmeister v. American Lithographic Co., 134 F. 321 (2d Cir. 1904). Compare also Howell, supra note 8 at 66 with Nimmer, supra note 8 at 212–13.

22. Section 26 provides in part: "In the interpretation and construction of this title * * * the word 'author' shall include an employer in the case of works made for hire." The initial question to be decided is whether an employment relationship existed. Nimmer, supra note 8 at § 62.2 states: "The crucial question in determining an employment relationship is whether the alleged employer has the right to direct and supervise the manner in which the writer performs his work. This is, of course, merely a particular application of the general agency doctrine relating to master and servant." (Footnote omitted.) Under this test, there clearly was an employment relationship. Furthermore, "one may be an employee regardless of whether he is paid

on the basis of a conventional periodic salary, on a piece work basis, on a fee or royalty basis, or even if the writing is done as an accommodation with no compensation at all." Id.

See Sawyer v. Crowell Publishing Co., 142 F.2d 497, 499 (2d Cir.), cert. denied, 323 U.S. 735, 65 S.Ct. 74, 89 L.Ed. 589 (1944), affirming 46 F.Supp. 471 (S.D. N.Y.1942) : "We conclude therefore that the district court was right in holding that any rights which Mr. Sawyer acquired by copyrighting the map [of Alaska prepared by Mr. Sawyer, the Executive Assistant to the Secretary of the Interior, in connection with an assignment in Alaska] must be held in trust for the United States." See also, United States Ozone Co. v. United States Ozone Co., 62 F.2d 881 (7th Cir. 1932) ; 7 Ops.Att'y Gen. 656 (1856). Compare, United States v. First Trust Co., 251 F.2d 686 (8th Cir. 1958) with Sherill v. Grieves, 57 Wash.L.Rep. 286, 20 Cpyrt.Off.Bull. 675 (Sup.Ct.D.C.1929). In Sawyer the Government did not intervene and ask for an assignment of the copyright as was done in the instant case However, in light of our holding of invalidity we do not reach the question of whether the Government is entitled to an assignment of the copyright or whether its remedy is limited to having a judicial declaration that the copyright is held in trust for it. See Ball, supra note 21 § 219 at 481; 12 ASCAP Copyright Law Symposium 98 n. 8 (1961).

23. Nimmer, supra note 8 § 66 at 267; 12 Syracuse L.Rev. 515, 516 (1961). See also Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7

Applying these criteria to the instant facts, it appears that the statue was a work made for hire. The plaintiffs were relieved of their regular duties and assigned to designing and constructing what eventually became "The Ultimate Weapon." During this period they were under military supervision, receiving their pay and their instructions from the Government, and, further, being supplied by the Government with all the equipment and materials necessary to complete their work.

■ The plaintiffs' counterargument is three-pronged: they claim that they were relieved of their "official duties" as opposed to their regular duties; that the work was created in a field outside their official classification as illustrators; and finally, that during the course of the nine months they worked on the statue they expended some of their own time and money and used some of their own materials. The first two contentions are not persuasive. The regular duties assigned to the plaintiffs were their official duties. When they were initially assigned to Headquarters Company their Military Occupational Specialty [MOS] was 814.10 which is that of illustrator. Upon being assigned to work on the statue they were not reclassified or given a new MOS, despite the fact that the MOS most closely corresponding to the sculpting they were performing was 815, that of model builder.[24] However, the fact that they were not reclassified

does not alter the nature or character of their work for the purposes here being considered. The Army regulations, in fact, provide for the assignment of work outside one's MOS if such an assignment is in the best interests of the Army;[25] and, although reclassification should follow, no rights, penalties or other consequences attend failure of reclassification.[26]

The plaintiffs' final contention, that they expended their own time and money carries little weight. For one thing, the Army spent over $12,000, whereas plaintiffs, by their own estimates, spent less than $50 between them. Furthermore, they make no claim that they requested the Army to furnish them with the supplies they claim to have purchased with their own funds, nor do they suggest that they requested and were denied reimbursement. Goodman, in fact, testified that although he expended money in the use of his own car, he never requested a Government vehicle. Under the plaintiffs' interpretation, any employee could circumvent the "works for hire" rule by expending a comparatively small amount of his own time and/or money on a project arising out of and performed within the scope of his employment. This contention is rejected.

Summary judgment in favor of the defendants may be entered in accordance herewith.

So Ordered.

---

L.Ed.2d 604 (1962). In Brattleboro Publishing Co. v. Winmill Publishing Corp., 369 F.2d 565 (2d Cir. 1966) the court stated that the works for hire doctrine "is applicable whenever an employee's work is produced at the instance and expense of his employer." Id. at 567.

24. The work which plaintiffs performed would not fall clearly within the MOS for Model Maker, either. Army Reg. 611–201 at 801 (20 May 1959) defines the duties of a model maker as follows: "Constructs scale models of terrain, bridges, military vehicles and weapons, using materials such as wood, paper mache, plastics and metal."

25. Army Reg. 611–203 § 33(e) (7 March 1955) provided: "When an assignment in

the primary advanced MOS is not possible it will be made in the most closely related MOS."

26. Army Reg. 611–203 § 35 (16 Sept. 1957) provided that when assignment was not possible within an individual's primary advanced MOS such "individual will be considered misassigned and will be reported for reassignment * * *. Pending reassignment or reclassification, the soldier will be assigned to duty in accordance with the following priorities: (1) MOS in the same entry group (1st two digits of MOS) * * *." The plaintiffs were assigned to work in accordance with this subdivision.