**Stuart SCHERR and Steven Goodman, Plaintiffs-Appellants,**

v.

**UNIVERSAL MATCH CORPORATION and United States of America, Defendants-Appellees.**

**No. 365, Docket 31962.**

United States Court of Appeals Second Circuit.

Argued March 24, 1969.

Decided Oct. 15, 1969.

**498**

Herbert Kanon, Bernard Olcott, New York City, for plaintiffs-appellants.

Edwin J. Jacob, Lauterstein & Lauterstein, New York City, for Universal Match Corp.

Brian J. Gallagher, Richard S. Toder, Asst. U. S. Attys., Robert M. Morgenthau, U. S. Atty., for United States.

Before WATERMAN, MOORE and FRIENDLY, Circuit Judges.

WATERMAN, Circuit Judge:

This is an action for copyright infringement brought by two ex-servicemen against Universal Match Corporation occasioned by Universal's commercial manufacture and sale of match books which bear a picture of a statue, entitled "The Ultimate Weapon." The statue had been created by plaintiffs during their service in the military. The complaint seeks an injunction against further infringement and an accounting of the profits, or, in lieu thereof, damages of $10.00 for each infringing match book copy. The United States of America, which had consented to Universal's commercial exploitation of "The Ultimate Weapon" without payment to plaintiffs, intervened as a defendant and interposed an answer denying plaintiffs' copyright and, alternatively, counterclaimed for an assignment of the copyright if it should appear that plaintiffs may have acquired one.

Both defendants moved for summary judgment. The district court held that there were no genuine issues of material fact and we agree with that holding. The opinion is reported at 297 F.Supp. 107 (SDNY 1967) (McGohey, J.). All the facts are undisputed except that appellants charge that the Army orally agreed to share with them any revenue derived from the commercial reproduction of the statue by others. This allegation is entirely lacking in supporting proof and hence the court below correctly disposed of the parties' claims in this litigation on defendants' motion for summary judgment.

Plaintiffs served in the United States Army during the years 1957 through 1959. As they had had some education

and experience in the fine arts, both were classified as illustrators and were assigned to the preparation of visual training aids at Fort Dix, New Jersey. During their leisure hours the two men put their artistic talents to further use. Plaintiff Goodman, with some assistance from plaintiff Scherr, was making a small clay table model of an infantryman when their creativity caught the eye of a public relations officer who brought them and their work to the attention of the deputy post commander. He, too, was favorably impressed, and suggested the construction of a larger, life-size statue of an infantryman which would serve as a symbol of Fort Dix. Goodman and Scherr agreed to undertake the project.

Thereafter, for approximately nine months, plaintiffs were relieved of their regular duties as illustrators and they devoted substantially all of their duty hours and some of their leisure time to "The Ultimate Weapon," the name the Army decided the statue should receive. During all stages of design and construction of the statue, the cost of the project was borne almost exclusively by the Army.[1] It supplied the necessary physical facilities, equipment, materials, and additional skilled and unskilled labor force. Total government expenditures were estimated at $12,367.90. Additionally, plaintiffs were at all times accountable to their military superiors to whom they submitted written progress reports.

On March 17, 1959 the statue was completed, and it was dedicated on March 20, 1959. Since its unveiling, it has at all times been, and is today, on public view at Infantry Park, Fort Dix, New Jersey. While the idea for the statue originated from the smaller clay model, the statue differs from the model. Moreover, plaintiffs never attempted to secure a copyright for their original clay model. Their claim of infringement rests solely upon whether they possess an effective copyright in the finished statue.

The statue is some 25 feet high. It consists of a 12 foot figure of a charging infantryman in full battle dress, with rifle thrust forward, with a field pack on his back, and with a bayonet, sheath, a shovel, canteen, hand grenades, and other implements attached to a cartridge belt supported by suspenders. He stands upon a pile of rocks about 3 feet high which, in turn, is set upon a 12 foot base. On the base are two plaques. The larger of them is inscribed: "The Ultimate Weapon, the only indispensable instrument of war, the fighting man." The smaller plaque bears the names of plaintiffs and two of their assistants. Neither plaque bears any copyright notice.

However, the plaintiffs affixed a notice of copyright to the statue prior to the unveiling.[2] Fearing they would encounter difficulties if the Army became aware of their copyright claim, they purposely placed the notice where it would not be readily detectable. They put it on the pack resting on the soldier's back where it is twenty two or twenty three feet above the ground and is entirely invisible to anyone standing on the ground. Subsequently, some three months after the unveiling, plaintiffs registered their claim of copyright in "The Ultimate Weapon."

Defendants' motion for summary judgment raised three defenses to plaintiffs' copyright claim. First, they asserted that "The Ultimate Weapon" was a "publication of the United States Government" within the meaning of 17 U.S.C. § 8, and therefore not copyrightable. It was also urged that the notice of copyright was inadequate, see 17 U.S.C. §§ 10, 19; 37 C.F.R. § 202(a) (2), and it was further claimed that any and all copyright interest belongs to the U. S. Government because the statue was con-

---

1. Plaintiffs' only expenses were estimated at less than $25.00 each for tools and books. Further, it has never been claimed that reimbursement, if requested, could not have been obtained.

2. The notice affixed by plaintiffs contains a letter C enclosed within a circle; the names Stuart Scherr and Steven Goodman; and the date, 1959.

**500**

structed during the course of plaintiffs' employment by the U. S. Army. 17 U.S.C. § 26. The district court held the statue was not a "publication of the United States Government" but granted defendants' motion based upon the assertions that the copyright notice was inaccessible to view and hence inadequate, and that if there were a valid copyright it inures to the benefit of plaintiffs' employer, the United States Army.

█ We agree that if any copyright interest exists, it is the exclusive property of the United States Government, and on this basis we affirm the judgment below. Accordingly, we do not have to decide whether the district court was correct in ruling that the statue was not a "Government publication" and that the notice of copyright was inadequate.[3]

█ "Authors and proprietors", according to § 9 of the Copyright Law, 17 U.S.C. § 9, are entitled to the copyright of a work of art. By § 26, 17 U.S.C. § 26, an "author" is further defined to include "an employer in the case of works made for hire." This is not to say, however, as the literal language of the statute might imply, that an employer and an employee are precluded as a matter of law from agreeing that the copyright in the resulting work shall vest in the employee. See, generally, Nimmer, Copyright § 62.1 (1968). Rather, § 26 merely creates a rebuttable presumption of copyright in the employer, a presumption which can be overcome by evidence of a contrary agreement between the parties. Id., Brattleboro Publishing Co. v. Winmill Publishing Corp., 369 F.2d 565, 567–568 (2 Cir. 1966) (Kaufman, J.); Yardley v. Houghton Mifflin Co., 108 F.2d 28 (2 Cir. 1939), cert. denied, 309 U.S. 686, 60 S.Ct. 891, 84 L.Ed. 1029 (1940) (presumption rests upon presumed intention of parties); Kinelow Publishing Co. v. Photography in Business, Inc., 270 F. Supp. 851 (SDNY 1967). But see in *Brattleboro, supra* at 569 (concurring opinion, Lumbard, Ch. J.) (no rebuttable presumption to be overcome—intention of parties controlling).

█ In the case at bar, the bare allegations by plaintiffs of an agreement contrary to the statutory presumption, without more, do not negate the presumption and do not create a triable issue of fact as to the intention of the parties. See *supra* at p. 498.

█ Even if it be assumed that the relationship here was an employment relationship, it is only when "an employee creates something in connection with his duties under his employment, [that] the thing created is the property of the employer and any copyright obtained thereon by the employee is deemed held in trust for the employer," Sawyer v. Crowell Pub. Co., 46 F.Supp. 471, 473 (SDNY 1942), aff'd 142 F.2d 497 (2 Cir.), cert. denied, 323 U.S. 735, 65 S.Ct. 74, 89 L.Ed. 589 (1944). Also see Brown v. Mollé Co., 20 F.Supp. 135, 136 (SDNY 1937), citing Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903). We must consider whether this doctrine applies to this case.

█ The essential factor in determining whether an employee created his work of art within the scope of his employment as part of his employment duties is whether the employer possessed the right to direct and to supervise the manner in which the work was being performed. Nimmer, Copyright § 62.2 (1968); Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639 (2 Cir. 1967). Other pertinent, but non-essential, considerations, are those indicating at whose insistence, expense,

---

3. The district court thought its alternative holding that the copyright notice was invalid obviated the need for it to decide whether the Government is entitled on its counterclaim to an assignment of the copyright or whether the Government's remedy is limited to having a judicial declaration that the copyright is valid and should be held in trust for it. Though we have not considered the question of the validity of the notice, we do not see any necessity to make such determinations.

time and facilities the work was created. See Sawyer v. Crowell Pub. Co., *supra,* 46 F.Supp. at 473, but see Public Affairs Associates, Inc. v. Rickover, 109 U.S. App.D.C. 128, 284 F.2d 262 (1960), vacated per curiam on other grounds, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962), on remand, 268 F.Supp. 444 (D.D.C.1967) (held use of government duplicating machine, government paper and government secretary not determinative). Additionally, the nature and amount of compensation or the absence of any payment received by the employee for his work may be considered; but when compared with the above factors it is of minor relevance. See Nimmer, *supra* at § 62.2.

■ Under the foregoing test it is strikingly obvious that if an employer-employee relationship between the Government and these plaintiffs actually existed, any ownership in the work designed by plaintiffs necessarily belongs to the Government. The Army's power to supervise; its exercise, though a limited one, of that power; and the overwhelming appropriation of government funds, time and facilities to the project, are all undisputed. These facts contrast sharply with the facts in the cases plaintiffs rely upon to support a contrary conclusion. Public Affairs, Inc. v. Rickover, *supra;* United States v. First Trust Co. of Saint Paul, 251 F.2d 686 (8 Cir. 1958); Sherrill v. Greaves, 57 Wash.L. Rep. 86 (D.C.Super.Ct.1929). Each of those cases concerns writings of government employees relating to their employment, but written for the most part *during off-duty hours;* whereas plaintiffs created their work of art pursuant to a formal government-commissioned project undertaken at almost complete government expense *during regular duty hours.*

■ Plaintiffs, however, contend that since they were classified in a military occupation specialty [(MOS) 814.10] as illustrators and were not reclassified as sculptors, their work as sculptors was outside the regular course of their employment. Their position is untenable. The failure of a serviceman's MOS classification to depict accurately his work assignment is, at most, a technical error, and cannot under any circumstances suffice to determine copyright ownership.

Arguably, however, Congress only intended the "works made for hire" statute to extend to voluntarily formulated employment relationships, and appellants therefore would maintain that the relationship between the United States Government and its military personnel who are drafted or who enlist to avoid induction goes beyond the act's contemplation. Certainly it is somewhat of a strain to classify such a relationship as one of employment voluntarily entered into. Unlike the ordinary employment contract that a talented person might be successful in obtaining from an employer, even the most talented serviceman does not possess the bargaining power to negotiate with the military the terms of his service. On the other hand, plaintiffs here did possess some bargaining power. They were not required to engage in the work they did in order to fulfill their military obligations; they did so voluntarily. In all probability they were glad to be relieved of their regular duties and welcomed the opportunity to be engaged in work more akin to their artistic talents. Perhaps, had they openly expressed their desire to retain a copyright interest in their artistic creation, the Army would not have objected. On balance, therefore, in light of the voluntary nature of plaintiffs' work; the compensation received, though assuredly minimal; and the absence of any concrete evidence of legislative intent to exclude from the coverage of 17 U.S.C. § 26 any works created by military personnel while fulfilling their obligation to serve their country, we must conclude that the Government did not violate any right of the plaintiffs when it agreed that defendant Universal could depict "The Ultimate Weapon" upon its match book covers.

The judgment below is affirmed.

FRIENDLY, Circuit Judge (dissenting):

In this unusual case my brothers have given the definition in 17 U.S.C. § 26 that "the word 'author' shall include an employer in the case of works made for hire" an effect far beyond what I consider the bounds that Congress could have intended. While facts like these may be unlikely to recur, the implications of the opinion are sufficiently alarming to call for an expression of dissent.

Although the course of decision has gone past the point where an argument could be mounted on the failure of the definition to say that the word "author" shall *not* include the true author in the case of "works made for hire," a position the majority's opinion necessarily entails, it is worth reflecting why the statute is phrased in the curiously back-handed way it is. The rather obvious reason is that the Constitution, Art. I, § 8, authorizes only the enactment of legislation securing "authors" the exclusive right to their writings. It would thus be quite doubtful that Congress could grant employers the exclusive right to the writings of employees regardless of the circumstances. In line with that it has been suggested that, in order to be constitutionally viable, § 26 must be limited to instances where an assignment of future copyright may fairly be implied. Nimmer, Copyright § 6.3 (1968). However that may be it is surely true that, both in the Constitution and in the Copyright Act, the emphasis is on protecting the "author" and that any principle depriving him of copyright and vesting this in another without his express assent must thus be narrowly confined.

It is often said, as in the majority opinion, that the essential factor in applying the "work for hire" doctrine is "whether the employer possessed the right to direct and to supervise the manner in which the work was being performed." See Nimmer, Copyright § 62.2. Where the employer in fact tells the employee pretty much what to do, vesting copyright in the former is wholly consistent with the policy of the Copyright Act since the creativity can be said to be primarily the employer's and the employee has simply carried out his instructions. In fact the decisions go beyond this and also vest copyright in the employer where he has no intention of controlling the detailed activity of the employee but the latter has been employed for the very purpose of producing copyrightable material. The paradigm instance is the man hired by a music publisher to write songs. To hold that the writer has the copyright would make the contract of employment senseless. A somewhat closer case (on which there is some division of authority, see Nimmer, Copyright § 63) concerns the independent contractor commissioned to create a work of art. Even here, while there may not have been an understanding by both parties at the time of contracting that the purchaser should be free to publish or authorize copying of the work, it is not unreasonable to assume in the absence of contrary proof that the parties expected the purchaser to wind up owning the work lock, stock, and copyright and that the artist set his price accordingly. To allow the artist to retain the copyright would thus deprive the purchaser of his bargain and give the artist a windfall. Both these situations, therefore, can be squared with the policy of the Constitution and the Copyright Act on the basis of carrying out what the parties contemplated at the time of contracting, or at least what they probably would have contemplated if they had thought about it.

The majority concedes "it is somewhat of a strain" to assimilate to such cases that of two men who were drafted into the Army or enlisted to avoid the draft and received nothing more than meager military pay. At the time the "employment" relation began, no one had any thought of the production of copyrightable works. And I find no sufficient basis for inferring an intention to vest copyright in the Government from the circumstances under which the plaintiffs

translated the model they had already created into a life-size statue. Such an assignment, to a task that would have commanded a high price if performed by a civilian, bears no resemblance to plaintiffs' previous assignment in preparing visual training aids. While the lack of basis for the required inference would be clearer if plaintiffs were world-famous sculptors, I do not find the difference significant.

In fact the Government's position does not really rest on an inference of probable intent but rather on the supposed unfairness of according copyright to the plaintiffs for a statue allegedly representing the expenditure of $12,367.90 of government funds. Even assuming *arguendo* that such a consideration would suffice to trigger the "work-for-hire" principle, the unfairness is not obvious to me. The Government wanted a statue to display at Fort Dix and got it; there is nothing to suggest it ever thought about publishing copies of the work, with consequent need for owning the copyright. Moreover, the figures are decidedly suspect. They include considerable amounts for the construction of the base of the statue and for moving it to various sites that were considered suitable, and salaries (including an estimate for off-duty hours) of military personnel who would have been paid anyway. On the other hand they do not reflect plaintiffs' claim to have spent some 1,950 hours of valuable leisure time on the statue. If relative financial contributions are the basis for the majority's vesting copyright in the Government, the case, at the very least, is thus inappropriate for summary judgment.

Turning to the two other grounds relied on by the defendants for their motions, I agree with the district court, 297 F.Supp. at 110–111, that the statue was not a publication of the United States Government so that plaintiffs would be deprived of copyright by 17 U.S.C. § 8. But I disagree with its ruling, 297 F. Supp. at 111–112, based upon the in-

adequacy of the copyright notice. Such notice is required only when a person seeks to "secure copyright for his work by publication thereof with the notice of copyright required by this title," 17 U.S. C. § 10. As opposed to this, 17 U.S.C. § 12 provides an alternate procedure for obtaining copyright "of the works of an author, of which copies are not reproduced for sale." Under this section if the article sought to be copyrighted is a work of art, all that needs to be done at the outset to secure copyright is to supply a photograph, which Scherr and Goodman did. The deposit of copies is required only "where the work is later reproduced in copies for sale," and it is the copies that must bear the copyright notice. Hence, so long as Scherr and Goodman did not "publish" the statue or authorize the publication of copies of it, they were under no obligation to affix the notice at all. Such a position is essential if artists are to be spared the dilemma of either defacing the work of art with a plainly visible notice or losing copyright protection. In light of that policy I would also hold that the display of the statue was not a publication, see Nimmer, Copyright § 54, although a court presumably would exercise its discretion, 17 U.S.C. § 101, not to grant relief against persons whose infringement lay only in photographing the statue for their own pleasure, see 297 F. Supp. at 112, if, as is hardly likely, the plaintiffs should ever seek this.

While I would therefore reverse the judgment for the defendants, it does not follow that one should be entered for the plaintiffs—which indeed, they have not sought. When interviewed by a lieutenant colonel for the Judge Advocate General's office shortly after the unveiling of the statue, Scherr stated that he had no copyright. This might create an estoppel, at least as regards liability for damage as distinguished from an injunction against future infringement.

I would reverse and remand for further development of the facts.