Jerome SIEGEL and Joseph Shuster, Plaintiffs,

v.

NATIONAL PERIODICAL PUBLICATIONS, INC., et al., Defendants.

No. 69 Civ. 1429.

United States District Court, S. D. New York.

Oct. 18, 1973.

Coudert Brothers, New York City, for plaintiffs; Carleton G. Eldridge, Jr., Gordon T. King, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendants; Edward C. Wallace, Marshall C. Berger, New York City, of counsel.

LASKER, District Judge.

Although Clark Kent, generally known as Superman, is happily capable of solving all problems without going to court, his creators and exploiters, mere mortals like the rest of us, are not so fortunate. Jerome Siegel and Joseph Shuster are Superman's creators. They seek a declaration that they, and not the defendant National (the other defendants are National's officers) are entitled to the copyright renewal rights of the renowned comic strip. National counterclaims for a declaration in its favor. It is stipulated that both plaintiffs and defendants have made timely renewal filings with the Register of Copyright. The matter comes before us on defendants' motion for summary judgment dismissing the complaint and declaring National to be the owner of the copyright of all Superman strips during the renewal term. We find, on the material facts as to which there is no genuine issue, that National is the owner of the copyright renewal term and grant the motion.

I.

This is not the first time the parties have locked horns in a contest as to rights to Superman. As indicated below, plaintiffs instituted an action on the subject against National in 1947 in the New York Supreme Court for the County of Westchester. The court made voluminous findings of fact and conclusions of law. Although the issue of renewal rights was not specified in that litigation, we hold that, on the facts found by the court, which are binding on the parties here, National is the owner of *all* rights in Superman. The facts, as we now describe them, are those found by the State Court,[1] as supplemented by correspondence between the parties marked at a deposition in this action, and, where appropriate, references are made to those findings.

II.

In 1933, Siegel conceived the idea of a cartoon strip, whose feature character was a man of superhuman strength who would perform great feats for the public good. Siegel discussed his idea with Shuster, an artist, and together they prepared a comic strip embodying the idea. They did not publish the strip but continued to collaborate on other cartoon strips, some of which they sold for publication between 1933 and 1938.

1. The plaintiffs' 9(g) statement submitted on this motion "disputes" certain findings of fact made by the State court and the interpretation of some of those findings as set forth in defendants' 9(g) statement. The principles of collateral estoppel and *res judi-* *cata* bar plaintiffs' "dispute" of any finding by the State court. As to the question of interpretation of the findings, we disagree with plaintiffs' view and agree with defendants.

One of their customers during that period was the Nicholson Publishing Co., which purchased material from plaintiffs on behalf of Detective Comics, Inc. (National's predecessor in interest). When, in late 1937, Nicholson went out of business, Detective acquired some of its magazine properties.

On December 4, 1937 Detective entered into a written employment contract with plaintiffs (Exhibit B, annexed to Answer) relating to two features known as "Slam Bradley" and "The Spy" which plaintiffs had been furnishing to Nicholson. This contract provided that the plaintiffs would give their exclusive services as artists in producing "Slam Bradley" and "The Spy" for a period of two years and that "all of these products and work done by said Employee for said Employer during said period of employment, shall be and become the sole and exclusive property of the Employer". The agreement also provided that any new or additional features were to be submitted first to Detective who was given an option on them.

When, in 1938, Detective decided to issue a new comic magazine, to be named Action Comics, it reviewed the Superman material which plaintiffs had prepared in 1933, and requested them to revise and expand it to a full length production suitable for magazines. Plaintiffs submitted the expanded material in February, 1938. On March 1, 1938, prior to the first printing of the first issue of Action Comics, Detective sent Siegel a proposed release (Exhibit A, annexed to Answer). The release, which plaintiffs executed, transferred to Detective the first thirteen page Superman strip, "all good will attached thereto and *exclusive* right to the use of the characters and story, continuity and title of strip . . . to have and hold *forever* and to be your *exclusive* property . . ." (emphasis supplied).

On April 18, 1938, Detective published the Superman strip prepared by plaintiffs in the first issue of Action Comics. After the initial publication, plaintiffs continued to supply Detective with Superman strips for publication. On September 22, 1938, Detective, plaintiffs, and McClure Newspaper Syndicate executed agreements for the newspaper syndication of Superman and other strips. Plaintiffs and Detective simultaneously executed a new long-term employment agreement which stated that Detective was "exclusive owner" of Superman and of the "right to publish" Superman comics. (Findings of Fact 44–46, Exhibit D, annexed to Answer).

As Superman became increasingly popular, certain changes occurred in the relationship between plaintiffs and Detective. Plaintiffs ceased work on other cartoon features to concentrate on the Superman strip. With this change, plaintiffs and Detective executed a supplemental employment agreement on December 19, 1939, increasing plaintiffs' compensation and reiterating that Detective was the "sole and exclusive owner" of Superman, of "all rights of reproduction and of *all copyright and all rights to secure copyright registration* in respect of all such forms of reproduction . . ." (Opinion of Judge Young in the Westchester action, Exhibit C, annexed to Answer, emphasis added).

The 1939 agreement was the last written agreement between the parties until 1947. During the intervening years plaintiffs' compensation increased to $1,000. per release plus royalties from newspaper syndication and other forms of commercial exploitation. By 1947, plaintiffs' total compensation from all sources for the strip amounted to over $400,000.

### III.

In 1947, plaintiffs brought the action we have described against National, Detective's successor, and several of its officers, seeking, among other things, a determination that the March 1, 1938 release was void, and a declaration of the rights of the parties.

The Westchester action was tried before Official Referee J. Addison Young who rendered a detailed opinion on No-

vember 1, 1947, finding the March 1, 1931 release valid and holding that National, not plaintiffs, owned all rights to Superman. On April 12, 1948, Judge Young signed Findings of Fact and Conclusions of Law. His Conclusions of Law included the following:

"1. By virtue of the instrument of March 1, 1938, plaintiffs transferred to DETECTIVE COMICS, INC. *all* of their rights in and to the comic strip SUPERMAN including the title, names, characters and concept as same were set forth in the first release of said comic strip published in the June, 1938 issue of the magazine 'Action Comics' and by virtue of said instrument DETECTIVE COMICS, INC. became the *absolute* owner of the comic strip SUPERMAN, including the title, names, characters and concept as the same were set forth in the said first release." (Exhibit D, annexed to Answer, emphasis added)

This conclusion was incorporated almost *verbatim* in an interlocutory judgment signed on April 12, 1948, from which neither side perfected an appeal. Instead, the parties began settlement negotiations, and, on May 19, 1948, signed a stipulation under which National was to pay (and subsequently did pay) some $94,000. in exchange for all rights to Superman and to "Superboy," another cartoon strip created by plaintiffs whose ownership was contested. The stipulation (Exhibit F, annexed to Answer) recited the first conclusion of law just quoted and further stated that:

"7. Defendant NATIONAL COMICS PUBLICATIONS, INC. is the *sole and exclusive* owner of and has the sole and exclusive right to the use of the title SUPERMAN and to the conception, idea, continuity, pictorial representation and formula of the cartoon feature SUPERMAN as heretofore portrayed and published . . . *and such sole and exclusive ownership includes, but is not limited to* the fields of book and magazine publications, newspaper syndication, radio broadcasts, dramatic presentations, television, motion picture reproduction and all other forms of reproduction and presentation, whether now in existence or that may hereafter be created, together with the absolute right to license, sell, transfer or otherwise dispose of said rights." (Emphasis added).

On May 21, 1948, Judge Young signed a final consent judgment incorporating this provision and stating:

"ORDERED AND ADJUDGED that plaintiffs, their agents, servants and employees, be and they hereby are enjoined and restrained from creating, publishing, selling or distributing or permitting or causing to be created, published, sold or distributed any material of the nature heretofore created, produced or published under the title SUPERMAN, or any material created, produced or published in imitation thereof, or from using, permitting or causing to be used in connection with any comic strip or other material created by them the title SUPERMAN or any title imitative of the title SUPERMAN or which shall contain as part thereof the word 'SUPER'." (Exhibit G, annexed to Answer).

## IV.

■■ Defendants move for summary judgment on two grounds: first, that the initial Superman strip was a "work for hire" within the meaning of the Copyright Act and second, that the various agreements between the parties, as well as the consent judgment in the Westchester action divested plaintiffs of the renewal copyrights. Before we discuss these contentions, we note that the findings of the State Supreme Court in the Westchester action are binding upon us here. Vernitron Corp. v. Benjamin, 440 F.2d 105, 108 (2d Cir. 1971). The terms of the stipulation of settlement in that action, and the consent judgment are also binding. Stuyvesant Insurance Co. v. Dean Construction Co., 254 F. Supp. 102, 110 (S.D.N.Y.1966), aff'd on opinion below, 382 F.2d 991 (2d Cir.

1967). Furthermore, the issues which plaintiffs want to litigate in this action could have been raised in the Westchester action, and consequently are barred by *res judicata* as well, so that summary judgment must be entered on this ground in addition to those we are about to discuss.

We find that Superman is a "work for hire" within the meaning of the Copyright Act, 17 U.S.C. § 26. In Picture Music, Inc. v. Bourne, 314 F.Supp. 640, 650–651 (S.D.N.Y.1970), Judge Pollack ably described the elements of an employment for hire: "The existence of an arrangement going beyond an assignor—assignee relationship," the payment of wages or other remuneration, the "right of the employer to direct and supervise the manner in which the work is performed," and the "existence of an express contract for hire, expecially one calling for an author to devote his exclusive artistic services to his employer." These elements were indisputably present in the relationship between plaintiffs and Detective. The Westchester Court found that on December 4, 1937, plaintiffs entered into a written contract of employment with Detective with reference to two comic features known as "Slam Bradley" and "The Spy" (Finding of Fact 15) which provided that plaintiffs would "give their exclusive services as artists" in producing these features and that "any new and additional features which Employees produce for use in a comic magazine are to be first submitted to Employer, who reserves the right to accept or reject same within a period of Sixty days" (Finding of Fact 15).

The Westchester court also found as a fact that after examining the 1933 Superman material, Detective "returned it to plaintiffs for revision and expansion into a full-length thirteen page comic strip release suitable for magazine publication" and that plaintiffs complied with Detective's requests (Findings of Fact 21, 22). The court further found that the release executed by plaintiffs on March 1, 1938, repre-sented the exercise by Detective of the option granted to it by the employment agreement of December 4, 1937 (Finding of Fact 29). These findings, particularly when viewed in conjunction with the correspondence between the parties during 1937–38, establish that Detective as employer supervised and directed the work of plaintiffs in connection with Superman.

Even if the relationship between Detective and plaintiffs was not a classic employment relationship, the Second Circuit's decision on appeal in Picture Music, Inc. v. Bourne, 457 F.2d 1213, 1216–1217 (2d Cir. 1972), requires a finding that Superman was a "work for hire." There the court, in holding that the work of an independent contractor was a work for hire if it was done "at the instance" of one who commissioned the work, observed that "The purpose of the statute is not to be frustrated by conceptualistic formulations of the employment relationship."

There can be no doubt that the plaintiffs' revisions of the 1933 Superman strip in 1938 were done at the instance of Detective.

Plaintiffs contend, however, that notwithstanding the employment relationship, Superman was a fully developed work by 1933 so that, as a matter of law it cannot be a "work for hire". The authority cited for this proposition, Scherr v. Universal Match Corp., 417 F.2d 497 (2d Cir. 1969) actually militates against plaintiffs' position. That case dealt with the copyright status of a statue in an Army post, which the plaintiffs, two enlisted men, had constructed pursuant to an Army work assignment. The assignment grew out of a clay model of the statue created by the two men during their leisure time. In deciding that the larger statue was a work made for hire, the court said:

"While the idea for the statue originated from the smaller clay model, the statue differs from the model. Moreover, plaintiffs never attempted to secure a copyright for their original clay model. Their claim of in-

fringement rests solely upon whether they possess an effective copyright in the finished statue." (*Scherr, supra,* at 499).

The court's reasoning in *Scherr* is controlling here. The court in the Westchester action explicitly found that the original (1933) embodiment of the Superman concept consisted of "a few panels suitable for newspaper syndication" (Finding of Fact 19), and that the strip was suitable for magazine publication only after plaintiffs "resubmitted such revised and expanded material" to Detective (Findings of Fact 21, 22). Moreover, the Westchester court found that the Action Comics strip of 1938, rather than the 1933 newspaper strip, "constituted the formula for the continuing SUPERMAN series to come" (Finding of Fact 22). Res judicata bars plaintiffs from relitigating this issue.

## V.

Defendants also argue that the various agreements between the parties, as well as the stipulation of settlement and the consent judgment in the Westchester action transferred the renewal copyrights to Detective. Concededly, none of the agreements between the parties, or the findings in the Westchester action expressly refer to the transfer of the renewal rights. Therefore, the intent of the parties must be established from the language of the agreements and the attendant circumstances.

We believe that the various agreements between the parties consistently reiterated an intention to give to Detective all of the rights in Superman, with no reservation of any kind in plaintiffs. The 1937 employment agreement stated that all work on these features "shall be and become the sole and exclusive property of the Employer, and the Employer shall be deemed the sole creater thereof . . . ," and gave Detective an option on "any new or additional features" created by plaintiffs.

The Westchester court found that the March, 1938 release represented an exercise of that option for the Superman strip. The release transferred "such work and strip, all good will attached thereto and exclusive right to the use of the characters and the story, continuity and title of [the] strip . . . to [Detective] and [its] assigns to have and to hold forever and to be your exclusive property." It also stated that "The intent hereof is to give you exclusive right to use and acknowledge that you own said characters or story and the use thereof exclusively."

The supplemental employment agreement of September 22, 1938 "expressly confirmed that DETECTIVE COMICS, INC. was the exclusive owner of the comic strip known as SUPERMAN . . . " and the consent judgment permanently enjoined plaintiffs from using or furnishing the product to any other person or publication (Finding of Fact 45).

The Westchester court's conclusions of law in the 1947 action stated that by the March 1, 1938 instrument plaintiffs transferred "all their rights in and to the comic strip 'SUPERMAN' " and that Detective became the "absolute owner" of the strip (Conclusions of Law # 1, Exhibit D, annexed to Answer).

The language of the interlocutory judgment in that action, as well as the language of the final judgment and the stipulation of settlement is similarly unequivocal. By the stipulation, Paragraph 10, plaintiffs further acknowledged defendants' "absolute right to license, sell, transfer or otherwise dispose of said rights" (Exhibit F, annexed to Answer).

In the face of this repeatedly unequivocal language, plaintiffs cite several authorities for the proposition that general language of assignment does not convey the renewal copyright unless the intention to convey it appears by unambiguous extrinsic evidence. Venus Music Corp. v. Mills Music, Inc., 261 F.2d 577 (2d Cir. 1958); Edward B. Marks Music Corp. v. Charles K. Harris Music Publishing Co., 255 F.2d 518 (2d Cir. 1958) cert. denied, 358 U.S. 831, 79 S.Ct. 51, 3 L.Ed.2d 69 (1958). While we

agree with this argument as a general proposition, these cases are not controlling here. In both *Venus* and *Marks,* the creator of the property executed general assignments of the property to one party with no mention of renewal rights, and subsequently executed specific assignments of the renewal rights to another party. The trial courts in both cases had to decide which of these ostensibly inconsistent instruments conveyed the renewal, and consequently looked to extrinsic evidence to establish the intent of the earlier, general assignments. Neither case suggests, however, that extrinsic evidence is required where, as here, the disputed agreements are internally consistent.

We believe that Geisel v. Poynter Products, Inc., 295 F.Supp. 331, 341–342 (S.D.N.Y.1968) is more in point. In *Geisel,* the plaintiff argued that implicit in the language of general assignment was a trade custom to the effect that defendant would hold the copyright in trust for him. It was undisputed there that defendant owned the renewal term, plaintiff contending that certain other rights were reserved to him. In confirming the assignment, the court said:

> "In ordinary acceptance, the expressions 'all rights' or 'complete rights' have a non-technical and literal meaning. Plaintiff has failed to sustain the burden of proof which is upon him when he seeks to impart to these words a connotation that is diametrically opposite to their plain, colloquial sense . . . The terms . . . when understood according to their plain meaning, signify a totality of rights . . . (*Geisel, supra,* at pp. 341–342.)

Plaintiffs also assert that the renewal term exists to give the creator a second chance to exploit a property whose marketability was uncertain at the time it was created. They point out that Detective was staffed by thoroughly experienced businessmen who surely would have explicitly referred to the renewal term in the various agreements between the parties had it actually been bargained for.

But these arguments prove too much. Plaintiffs certainly knew by 1947, if not before, that Superman was an extraordinarily marketable man, as well as one of unusual powers. Both parties were represented by distinguished counsel in the 1947 proceedings, which resulted in a stipulation worded in all-inclusive language. The fact that this language makes no specific reference to renewal rights militates as much as if not more strongly against plaintiffs than defendants, in whose favor all rights to Superman were confirmed on the face of the various agreements.

Since we find that plaintiffs are precluded from relitigating matters which could have been raised in the 1947 action, and since, on the material facts before us, Detective owns the renewal copyrights as a matter of law, defendants' motion for summary judgment to dismiss the complaint is granted.

It is so ordered.