R. Alain EVERTS, d/b/a The Strange Company, Plaintiff,

v.

ARKHAM HOUSE PUBLISHERS, INC., a Wisconsin corporation, Defendant.

No. 83–C–520–S.

United States District Court, W.D. Wisconsin.

Jan. 30, 1984.

As Amended May 8, 1984.

David E. Lasker of Buffett, Dew, Blaney, Olson & Lasker, Madison, Wis., for plaintiff.

Forrest D. Hartmann, of Quale, Hartmann, Bohl & Evenson, Baraboo, Wis., for defendant.

## MEMORANDUM AND ORDER

SHABAZ, District Judge.

This copyright and common law theft action is before the Court on the motion of defendant Arkham House Publishers, Inc. for summary judgment. The motion is granted.

Under Rule 56, Federal Rules of Civil Procedure, summary judgment is appropriate when, after both parties have had the opportunity to submit evidence in support of their respective positions and the Court has viewed such evidence in the light most favorable to the non-movant, there remains no genuine issue of material fact in the case. *Cedillo v. Int'l Ass'n of Bridge & Structural Iron Workers et al.*, 603 F.2d 7, 9 (7th Cir.1979).

The Court finds the following as facts for the purpose of this motion.

### FACTS *

1.  Plaintiff R. Alain Everts (Everts), an adult resident of Madison, Wisconsin, is the sole proprietor of The Strange Company, a publisher of books and other writings operating out of Madison, Wisconsin.

2.  Defendant Arkham House Publishers, Inc. (Arkham House) is a corporation organized under the laws of the State of Wisconsin whose principal business is book publishing and whose principal place of business is located on Lueders Road in Sauk City, Wisconsin.

3.  This action is principally one for copyright infringement pursuant to 17 U.S.C. § 101 et seq. (1976), and the infringement is alleged to have taken place in this judicial district.

4.  Sometime in 1973 or early 1974, publisher Everts approached poet and author Richard L. Tierney about the possibility of his, Everts, publishing a book of Tierney's poetry under the title, "Dreams and Damnations," the same title that Everts had originally proposed for a then-planned collection of Tierney's poems by another publisher. The parties apparently reached an agreement over the project, but that agreement was never reduced to writing.

5.  By letter of transmittal dated May 9, 1974 Tierney sent Everts three poems translated from French and three original poems for *Dreams and Damnations*.

6.  During the next several months, Tierney sent Everts another poem translated from French and sixteen additional original poems for inclusion in the project, bringing to 23 the total number of poems submitted by Tierney. Seven or eight of the poems had been previously published and copyrighted in various small circulation periodicals referred to by the parties as "fanzines."

7.  In the production of *Dreams and Damnations*, Everts controlled the design and format of the work, including artwork and typesetting, and paid production expenses. Everts also paid Tierney a total of $80 in the period before, during and after production designated as "advance royalties" from Tierney's 50% interest in the

---

* Many of the facts about the parties' course of dealing were derived from author Tierney's correspondence to plaintiff Everts that Everts incorporated by reference in his affidavit at paragraph three.

proceeds from the planned sale of 150 copies of the work.

8. In October 1975 Everts printed a first edition of *Dreams and Damnations* containing the 23 poems submitted by Tierney. The title page of the book read, "Dreams and Damnations by Richard L. Tierney Illustrations by James Faulkenberg The Strange Company." On the reverse side of the title page a statutory copyright notice stated, "Copyright 1975 by Richard L. Tierney."

9. There is a dispute over whether that notice was intended to copyright the book for Tierney as author or for Everts as the employer of an author creating a work for hire. Regardless of his intentions in affixing the notice, Everts twice tried to register his own copyright in the 1975 edition of *Dreams and Damnations*, but was unsuccessful due to technical mistakes in his application. At one point, Everts had listed himself as "Publisher and Editor" of the work.

10. Throughout the next several years approximately 30 copies of the 1975 edition were distributed to acquaintances of Everts or Tierney. There is a dispute over whether Everts actually sold some of those copies to members of the general public, but it is clear that he had originally intended to sell the 1975 edition, and that he accepted money in the form of "donations" from persons who received a copy of the book.

11. Throughout the next several years Tierney brought errors in the 1975 text to Everts' attention and they corresponded regarding a corrected edition of the work to be published sometime in the indefinite future.

12. During the same period Tierney's agent apparently negotiated with defendant Arkham House to produce a book of Tierney's poetry, including the poems contained in the 1975 *Dreams and Damnations*.

13. In April 1981 Everts published a second edition of *Dreams and Damnations* incorporating some of Tierney's corrections. The 1981 edition bore the following copyright notice: "Copyright 1975, 1981 by The Strange Company." Everts offered this edition for sale to the general public, though without much success.

14. After a few false starts, Everts succeeded with the assistance of his attorney in registering a copyright in the 1981 edition on September 22, 1981, the date on which the copyright office issued him a Certificate of Copyright Registration. On his successful application, Everts had listed The Strange Company as author of the work, which was stated to have been produced as a work for hire and to have been previously published in a 1975 edition for limited, free distribution to the author's friends.

15. Shortly thereafter, in November, 1981, defendant Arkham House published and distributed a book of Tierney's poetry entitled, "Collected Poems—Nightmares and Visions." *Collected Poems* contained the poems that had been published previously in both editions of *Dreams and Damnations*.

16. Everts warned Arkham House of its alleged infringement on two occasions and then filed this lawsuit on May 26, 1983.

## OPINION

The Court has jurisdiction over this action pursuant to 28 U.S.C.A. § 1338(a).

Under plaintiff Everts' interpretation of the events at issue in this action, *Dreams and Damnations* was created as a work for hire for The Strange Company in 1975 by Richard Tierney, distributed to a small circle of Tierney's friends at that time, and finally published and copyrighted in 1981 by The Strange Company. Under defendant Arkham House's view, the work was either published in 1975 and entered the public domain thereafter for lack of proper notice and registration with the copyright office, or it was not a work for hire because there was no written agreement between Everts and Tierney, a requirement for a work for hire created outside an employer-employee relationship. Neither interpretation is wholly correct.

■ The work was certainly copyrighted as of January 1, 1978, not injected into the public domain in 1975, whether or not the printing and allegedly limited distribution of the work at that time was a general publication within the meaning of that term in copyright law. If the 1975 edition was a general publication, the fact of publication with statutory notice of copyright in Tierney's name, even if The Strange Company was the correct claimant, was sufficient under the Copyright Act of 1909 to create a legitimate copyright in the work as a whole and in the individual poems published for the first time in the collection. 17 U.S.C. §§ 10, 21 (1970). *See Goodis v. United Artists Television, Inc.*, 425 F.2d 397 (2d Cir.1970). If, on the other hand, the printing and distribution of the 1975 edition was not a general publication, *Dreams and Damnations* remained protected under common law copyright through December 31, 1977, after which time it was copyrighted under the federal scheme by force of the Copyright Act of 1976 as a work created, but not published, before 1978. 17 U.S.C. §§ 301–303 (1976). Registration is irrelevant to the existence of a copyright under either the 1909 or 1976 statute. *See* 17 U.S.C. § 11 (1970); 17 U.S.C. § 408 (1976).

Thus, the only remaining issue here is whether plaintiff Everts owns the copyright in the poems published for the first time in *Dreams and Damnations*, as well as in that work's particular selection and compilation of poetry, as Tierney's employer in the creation of work for hire. Clearly, the work was not created in the context of an employer-employee, master-servant relationship, so analysis must center on whether there was the sort of employer-independent contractor relationship between Everts and Tierney that would justify a finding that the work was created for hire. Although the parties rely on the work-for-hire provisions of the Copyright Act of 1976, found at 17 U.S.C. § 101 (1976), the Court believes the law developed under the earlier statute would be applicable to these facts because the work was created before the effective date of the new statute. *See May v. Morganelli-Heumann & Assoc.*,

618 F.2d 1363, 1368 n. 4 (9th Cir.1980) (court refused to give § 101 retroactive effect). Besides, if the 1976 statute was applicable, the admitted lack of a written agreement between the parties and the type of work involved here (a book of poetry written by a single author) would summarily dispose of Everts' work-for-hire argument and his claim to the copyright. *Mr. B. Textiles, Inc. v. Woodcrest Fabrics, Inc.*, 523 F.Supp. 21, 24 (S.D.N.Y.1981) (only certain categories of commissioned works fall within work-for-hire doctrine of 1976 statute).

In a relatively recent case decided under the 1909 statute, *Scherr v. Universal Match Corp.*, 417 F.2d 497 (2d Cir.1969), the court applied the following criteria for determining whether a work was produced for hire within the meaning of the former § 26:

> The essential factor ... is whether the employer possessed the right to direct and to supervise the manner in which the work was being performed. Other pertinent, but non-essential, considerations, are those indicating at whose insistence, expense, time, and facilities the work was created.
>
> Additionally, the nature and amount of compensation or the absence of any payment received by the employee for his work may be considered.

417 F.2d at 500, 501 (citations omitted).

Although *Scherr* arose in the context of an employer-employee relationship, similar criteria have been applied in work-for-hire cases involving artists who were not employees, but who may have been considered independent contractors. Courts have found that the copyright belonged to the purchaser/employer and not the artist/independent contractor when the artist was paid a sum certain for the creation of a work according to the purchaser's specifications and the course of dealing between the parties established that the purchaser was buying the work and all the rights to it. *See Samet & Wells, Inc. v. Shalom Toy Co., Inc.*, 429 F.Supp. 895, 902 (E.D.N.Y.1977); *Brattleboro Publishing Co. v.*

*Windmill Publishing Corp.*, 369 F.2d 565 (2d Cir.1966); *Lin-Brook Builders Hardware v. Gertler*, 352 F.2d 298 (9th Cir. 1965). Conversely, when the artist's compensation depended upon factors outside of either party's control, the artist created the work independently, and the course of dealing between the parties established that the artist would retain the copyright, courts have held that the work was not created for hire and the copyright accrued to the artist. *Meltzer v. Zoller*, 520 F.Supp. 847 (D.N.J.1981); *Donaldson Publishing v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639 (2d Cir.1967).

■ It is apparent from the facts found above that Everts and Tierney did not have the sort of purchaser-artist relationship that would support a finding that *Dreams and Damnations* was a work created for hire. Rather than Everts commissioning Tierney for a sum certain to write poems for inclusion in a book of poetry, he merely approached Tierney about the possibility of his publishing a book of Tierney's poetry. Tierney, anxious to get his work published, sent Everts a number of poems that he had written for possible inclusion in the proposed work. Everts apparently liked the poems, agreed to publish them, and the parties also agreed to split the revenue from the planned sale of the work. Everts produced and published the work and, for whatever reason, paid Tierney his total potential royalties in advance. The work contained a copyright notice in Tierney's name and Everts initially designated himself as publisher and editor of the work.

■ Given these facts, Everts' conclusory assertion that he employed Tierney to create *Dreams and Damnations* as a work-for-hire cannot create a genuine issue of material fact as to the validity of Everts' registered copyright. The Court concludes that the relationship between the parties was a garden variety publisher-author relationship, albeit in the avocational atmosphere of the horror-fantasy genre publishing business. When the first edition of *Dreams and Damnations* was copyrighted, whether by publication with notice under the 1909 statute or by the effect of the 1976 statute's preemption clauses, the copyright belonged to Tierney, as he had yielded to Everts at most a non-exclusive license to publish his poetry. Thus, Everts cannot prevent further distribution of Arkham House's *Collected Poems*.

Pursuant to *Nemkov v. O'Hare Chicago Corp.*, 592 F.2d 351, 353 n. 1 (7th Cir.1979), Everts' common law theft claim is dismissed without prejudice.

Accordingly,

## ORDER

IT IS ORDERED that the motion for summary judgment of defendant Arkham House on plaintiff R. Alain Everts' copyright infringement claim is GRANTED, with costs and without attorney's fees.

IT IS FURTHER ORDERED that plaintiff's claim for common law theft is DISMISSED without prejudice.

