DONALDSON PUBLISHING CO.,
Plaintiff-Appellant,

v.

BREGMAN, VOCCO & CONN, INC.,
Defendant-Appellee.

No. 189, Docket 30367.

United States Court of Appeals
Second Circuit.

Argued Jan. 3, 1967.
Decided March 24, 1967.

Lewis A. Dreyer, New York City (Norma Hack and Rosen, Seton & Sarbin, New York City, on the brief), for appellant.

Max Chopnick, New York City (Theodore R. Kupferman, S. Leonard Wall, John G. Proudfit and Conner & Chopnick, New York City, on the brief), for appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and HAYS, Circuit Judges.

HAYS, Circuit Judge:

This is an action to determine the ownership under the Copyright Act, 17 U.S.C. § 24,[1] of the renewal copyright interest in eighty-seven songs written either alone or in collaboration with others by Walter Donaldson. Ownership is claimed by defendant under a contract, dated May 15, 1928, between Donaldson and the defendant, known at that time as Donaldson, Douglas & Gumble, Inc. Donaldson died before the commencement of the renewal term. His two surviving children obtained renewal copyrights which they assigned to the plaintiff, Donaldson Publishing Company. This appeal is from an order and judgment entered in the United States District Court for the Southern District of New York, dismissing plaintiff's complaint and declaring defendant to be the owner of the renewal copyrights.[2] We hold that plaintiff is the rightful owner of the title to the renewal copyrights. The decision is therefore reversed and the case remanded to the district court.

In 1927, Donaldson, who was a prominent and successful songwriter, Walter Douglas, a sales manager for a music publishing firm, and Mose Gumble, a professional manager in the music publishing business, began negotiations for the formation of a music publishing company. After numerous conversations the parties reached substantial agreement in the spring of 1928 deciding to form a corporation. They then consulted a well known attorney in the music publishing field, Nathan Burkan, who assigned his

---

1. § 24.  *Duration; renewal and extension.*

   The copyright secured by this title shall endure for twenty-eight years from the date of first publication, whether the copyrighted work bears the author's true name or is published anonymously or under an assumed name: *Provided,* That in the case of any post humous work or of any periodical, cyclopedic, or other composite work upon which the copyright was originally secured by the proprietor thereof, or of any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author) or by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further,* That in the case of any other copyrighted work, including a contribution by an individual author to a periodical or to a cyclopedic or other composite work, the author of such work, if still living, or the widow, widower, or children of the author, if the author be not living, or if such author, widow, widower, or children be not living, then the author's executors, or in the absence of a will, his next of kin shall be entitled to a renewal and extension of the copyright in such work for a further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright: *And provided further,* That in default of the registration of such application for renewal and extension, the copyright in any work shall determine at the expiration of twenty-eight years from first publication.

2. The Court made an express determination under Rule 54(b) of the Federal Rules of Civil Procedure that there was no just reason for delay in entering judgment on defendant's counterclaim for declaratory relief but reserved defendant's other claims for future determination.

associate, Charles Schwartz, to handle the matter.

After discussing with the parties the substance of their proposed transaction, Schwartz drew a draft of a pre-incorporation agreement. This instrument provided for the formation of a corporation to be known as Walter Donaldson, Inc., Music Publishers, with Donaldson as its president.

The agreement also set forth the rights and obligations of the parties to the corporation. Donaldson was to write and compose musical works for the corporation and was to receive specified royalties. Douglas and Gumble were to be employed by the corporation, and each was to receive $300 a week for his services.

The parties discussed the draft and proposed changes were noted in the margin by Schwartz. These amendments, including a paragraph providing that Donaldson was to have "a drawing account against royalties of $300 per week during the first six months of [his] employment and of $500 per week during the balance of the term," were embodied in the final agreement which was signed by the parties on May 4, 1928. About two weeks later, following the incorporation of Donaldson, Douglas & Gumble, Inc.,[3] each of the parties executed separate contracts with the corporation which repeated almost verbatim the language of the pre-incorporation agreement.

During the ensuing five years Donaldson wrote 87 songs, either alone or in collaboration with others, which were published by defendant pursuant to the agreement. Among the songs were many written by Donaldson for use in musical stage plays and motion pictures, including for example the stage and screen versions of the well-known "Whoopee." Under the agreement the corporation obtained copyrights on all these songs, but the dramatic and synchronization rights were held by Donaldson and he, rather than the corporation, received substantial payments for such rights from the producers to whom they were negotiated. Defendant was given the right to license mechanical reproductions of the show songs and to publish them.

Donaldson earned approximately $164,-000 in royalties during this period. Even so, by the end of the term of the agreement in 1933 his drawings from the corporation exceeded by $12,000 the amount of royalties he had earned. The defendant treated this overdraft as a debt which was discharged when, at Douglas' request, Donaldson surrendered his stock in the corporation in exchange for a general release relieving him of all liability arising from the operation of the business.

The principal question before us is whether the defendant's relationship to Donaldson was that of an "employer for hire" within the meaning of section 24 of the Copyright Act, 17 U.S.C. § 24 (set out in full in footnote 1, supra), which permits an "employer for whom [a copyrighted] work is made for hire" to renew and extend the copyright in such work for a further term of twenty-eight years. If Donaldson was not an employee for hire of the defendant corporation, then, under Section 24, Donaldson having died, his surviving children had the right to renew the copyrights.

■ We may say by way of preface to our opinion on the merits that we do not consider ourselves bound in this case by the "unless clearly erroneous" test of Federal Rule 52(a) with respect to the trial court's determination that Donaldson was an employee for hire. See Mamiye Bros. v. Barber SS. Lines, Inc., 360 F.2d 774, 776–778 (2d Cir.), cert. denied, 385 U.S. 835, 87 S.Ct. 80, 17 L.Ed.2d 70 (1966).

To support its contention that Donaldson was an employee for hire, defendant relies principally on the use of the term "employment" in the clause providing Donaldson with a drawing account,[4] and on the drawing account itself, which de-

---

3. This corporate name was chosen because the name "Walter Donaldson, Inc." was not available.

4. The clause provides:
"You shall have a drawing account against your royalties of $300. per week during

fendant contends was the equivalent of a salary. These contentions lack substantial merit.

■■ It is true that during the first three and one-half years of the agreement, Donaldson was paid weekly checks of $300, aggregating approximately $78,-000, each specifically designated "weekly drawing account." However, these payments represent less than one-half of the sum paid or credited to Donaldson in irregular amounts during the same period (approximately $167,000). No weekly drawing account was paid Donaldson during the final 18 months of the contract. Donaldson's request in August, 1932 that the weekly draw be restored was denied. At no time was he paid $500 per week as provided by the contract. At the end of the five year term of the agreement the $12,000 by which Donaldson's drawings exceeded his royalties was treated as a debt owed to the corporation. It thus seems clear that Donaldson's drawings from the corporation were not the wages of an employee for hire but rather constituted a loan which, to the extent drawings exceeded actual royalty earnings, had to be repaid.

The provision referring to Donaldson's period of "employment" was not contained in the draft pre-incorporation agreement and the parties have argued, with equal persuasiveness, that its subsequent inclusion was or was not intended to effect a change. However, we find a more compelling indication of their intention in the fact that the unequivocal language of the agreement, making it clear that Douglas and Gumble were to be employees,[5] is not repeated in the paragraphs concerning Donaldson. The word "employment" as applied to Donaldson appears to be a short-hand way of saying "during the period during which you will be writing songs to which the corporation has certain rights and will have certain royalties coming to you from such songs."

The actions of the parties and their construction of the agreement corroborate the conclusion that Donaldson was not an employee for hire. The money arrangement was heavily weighted in his favor. For example, within three months of the execution of the agreement Donaldson agreed to write the score for "Whoopee." He executed the contract in his own name and received the entire advance payment and a percentage of the box office receipts from this very successful show. Defendant received only the right, reserved to it in its contract with Donaldson, to publish the music; it never claimed any right to the consideration Donaldson received for writing the score and, in fact, subsequently made its own agreement with the producer, Florenz Zeigfeld, acquiring all the publishing rights which Ziegfeld could convey.

In December, 1929, Donaldson conveyed to Samuel Goldwyn the exclusive motion picture synchronization rights to the "Whoopee" score, receiving with his co-authors, a proportionate share of the $50,000 fee. Defendant did not receive any part of this fee or of the extra $5,-000 paid Donaldson for creating additional music for the motion picture version of "Whoopee."

Donaldson also wrote for Fox Film Corporation and Paramount Publix Corporation, and he, rather than defendant,

---

the first six months of your employment, and of $500. per week during the balance of the term. The corporation shall have the right to deduct such drawings from any royalties that may have theretofore or that may thereafter accrue to you."

5. The agreement provides:
"Douglas agrees to enter into the employ of the corporation for a period of five years from the date of its in-corporation, as Business Manager.
* * *
Gumble agrees to enter into the employ of the corporation for a period of five years from the date of its incorporation, as Professional Manager.
* * *"
Both Douglas and Gumble entered contracts with the corporation in which it is stated:
"We hereby employ you, and you hereby enter into our employ. * * *"

received the entire consideration under these contracts. While there was an agreement with Fox including a provision by which defendant consented to let its "employee" Donaldson work for Fox for a specified twelve week period, Donaldson did not sign this agreement; it was instead executed for him by Douglas, his attorney in fact.[6] The characterization of Donaldson in the Fox agreement is, therefore, far less significant than is the fact that Donaldson's relationship with defendant left him free to engage in these various outside writing activities from which he derived substantial independent income.

Moreover, an essential element of the employer-employee relationship, the right of the employer "to direct and supervise the manner in which the writer performs his work" (see Nimmer, Copyright, § 62.31 (1964)), is lacking here. No power to control or supervise Donaldson's performance was reserved to the corporation or exercised by it. Cf. Tobani v. Carl Fischer, Inc., 98 F.2d 57, 59 (2d Cir.), cert. denied, 305 U.S. 650, 59 S.Ct. 243, 83 L.Ed. 420 (1938).

This lack of control over Donaldson's performance, Donaldson's dominant role in the corporation, his freedom to engage in profitable outside activities without sharing the proceeds with defendant, the absence of any fixed salary and the language of the agreement itself indicate that Donaldson was not an "employee" in the substantial sense required by the Copyright Act.

Defendant contends that regardless of whether Donaldson was an employee for hire, it is entitled to the renewal copyrights under the infrequently invoked provision of section 24 of the Copyright Act, 17 U.S.C. § 24, vesting the renewal copyright "of any work copyrighted by a corporate body (otherwise than as assignee or licensee of the individual author)" in the corporation. While the meaning of this clause is not entirely plain (see Shapiro, Bernstein &

Co. v. Bryan, 123 F.2d 697, 699 (2d Cir. 1941)), its scope is quite limited. See Nimmer, Copyright, § 114.3 (1964). We hold that this provision does not apply to the facts of this case.

Donaldson's surviving children, as "children of the author" (17 U.S.C. § 24) properly obtained the renewal copyrights which have been assigned to plaintiff.

The decision is reversed and the case remanded.

---

6. No agreements involving the defendants were executed with Ziegfeld and Goldwyn in respect to the "Whoopee" music.