The OLYMPIA PRESS, Plaintiff,

v.

LANCER BOOKS, INC. and Publishers Distributing Corporation, Defendants.

No. 66 Civ. 4267.

United States District Court
S. D. New York.

April 3, 1967.

Donald S. Engel, New York City, for plaintiff (Arthur B. Cornfeld and Leon Friedman, New York City, of counsel).

Amster & Rothstein, New York City, for defendants (Bernard L. Goldstein and Benjamin Winston, New York City, ·of counsel).

## OPINION

RYAN, District Judge.

This action charges an alleged infringement by defendants of American ·copyrights issued to plaintiff on Volumes 2, 3, 4 and 5 of the English-language translation of "Juliette" by Wainhouse.

It comes before us on plaintiff's motion ʼfor a preliminary injunction restraining defendants from marketing any copy of their one-volume book entitled "Juliette" or from otherwise infringing plaintiff's copyrights. We have concluded that for the reasons hereafter stated plaintiff should be denied the relief now sought.[1]

Both defendants, New York corporations with their offices and principal place of business in New York City, are in the paperback "adult reader" business.

Plaintiff, THE OLYMPIA PRESS, is a French limited liability company, of which one Maurice Girodias is the managing director. For some years, at least since 1953, OLYMPIA has been publishing in Paris English-language translations of works of French authorship. Among the writings so published by OLYMPIA have been "The Bedroom Philosophers", "Justine", "120 days of Sodom", "The Story of Juliette", and some books described by Girodias as "little literary jokes", which "the American public knows as the English-language dirty books".

We are concerned here only with the English-language translation of "Juliette" printed in paperback books in Paris by OLYMPIA, a French work attributed to the notorious and unfortunate Donatien-Aldonse-Francois, Marquis De Sade. The English-language translation of this noisome writing was made under arrangement of OLYMPIA with one Austryn Wainhouse, an American citizen, who took the fanciful pen name—Pieralessandro Casavini. The book "Juliette" so translated was marketed by OLYMPIA in Paris as one of its "Travelers Companion Series"; planned to consist of five volumes, it was subsequently expanded by OLYMPIA to seven volumes. Wainhouse was the translator of the first five volumes and one John Crombie was the translator of Volumes

1. We do not have before us for decision whether these "adult" writings may be lawfully imported into or marketed in the United States.

six and seven. Volumes 1, 6 and 7 are not involved in this action.

■ It is undisputed that the French version of "The Story of Juliette" has long been in the public domain. The one-volume publication of the defendants —described as the "De Sade First American Publication of his greatest novel Juliette"—is stated on the cover to be a "revised and edited abridgement of Pieralessandro Casavini's translation of Juliette by the Marquis de Sade" and on the title page to be "abridged but unexpurgated from the original five volume work especially for the adult reader". The Wainhouse English-language translation was a "new work" subject to United States copyright, even though the original work written in French was in the public domain (17 U.S.C. Section 7). For the present motion only, we find that plaintiff has made a substantial showing that defendants' American one-volume publication is in principal part a verbatim and slavish copy which infringes the Wainhouse English-language translation. The defendants question the validity of the four copyrights in suit, asserting in fact and in law that plaintiff was not and cannot legally claim to be the "author" under the copyright law of the English-language translation which admittedly was the work of Wainhouse. They charge the plaintiff with fraudulent concealment and misstatements to the Copyright Office in order to procure the copyrights. While the certificates of registration are admissible as prima facie evidence of validity (17 U.S.C. Sec. 209), we find upon the present record that defendants have raised a substantial question as to the validity of plaintiff's copyrights which dictates that the temporary injunctive relief sought by plaintiff be denied.

The applications for all four copyright registrations were filed in the Copyright Office on May 27, 1966. It was not until plaintiff discovered defendants' publication prior to August, 1965, that he inquired of the Copyright Office what steps he should take to obtain copyright certificates in order to bring an action for infringement; the four certificates in suit were issued to plaintiff in July, 1966.

We first examine the four Certificates of Registration of a Claim to Copyright issued by the United States Register of Copyrights. The statements of plaintiff filed on these registrations disclose the following:

*Registration No. A.F. 24390—covering Volume II—*"The Story of Juliette"— lists as author "The Olympia Press" of French citizenship, address 7, rue Saint-Séverin, Paris 5 France; date of publication, July 30, 1959; place of publication, France; new matter in this version —English Translation.

*Registration No. A.F. 24391—covering Volume III—*again sets forth the identical statements as made with respect to Volume II, except that the date of publication is stated as April 30, 1960.

*Registration No. A.F. 24393—covering Volume IV—*is identical to Volumes II and III, except that the date of publication is given as June 30, 1960.

*Registration No. A.F. 24392—covering Volume V—*is identical to the other three volumes except that date of publication is given as April 30, 1961.

None of the four applications disclose that the actual English language translation sought to be registered was the work of Austryn Wainhouse; his name does not appear at all on the applications. On the application forms are instructions concerning copyrights of English language books manufactured abroad and works by United States citizens, alerting an applicant to the peculiar status of such works and to the necessity of disclosing such pertinent information in order to determine their eligibility for copyright protection. That plaintiff did not supply this information was, as we shall demonstrate, no innocent omission but a deliberate one because of its awareness of the provisions of the Act.

This brings us to the pertinent statute —the Manufacturing Clause of the Copyright Act, 17 U.S.C. § 16, which requires that English language works, in order to

receive copyright protection, must be typeset, printed and bound within the United States. There is no question but that plaintiff's works were not so done. The only exception to this clause which need detain us is that which permits copyright on a foreign book in the English language imported into the United States within five years after first publication in a foreign state if ad interim copyright in said work has been obtained pursuant to Section 22 of the Act prior to the importation in the United States of any copy. Plaintiff did not obtain ad interim copyright under Section 22.

The Act under Section 9(c) exempts from the Manufacturing Clause alien authors whose country is a signatory to the Universal Copyright Convention or whose work was first published in such country, but significantly excepts from this exception "works of an author who is a citizen of, or domiciled in the United States of America regardless of place of first publication * * *". France is a signatory to Universal Copyright Convention; the works in suit were first published there; the question is who was their author. On the assumption that Wainhouse, the translator, is the author of the works, defendants conclude that the exception to the Manufacturing Clause does not apply to them, and that they cannot be copyrighted. On the assumption that plaintiff and not Wainhouse is the "author" of the work, plaintiff argues that the works do come within the exception, relying for its position that it is the author of the works on the language of Section 26, 17 U.S.C., which includes within the definition of author "an employer in the case of works made for hire"; that is, that the translator Wainhouse was an employee of plaintiff rather than an independent writer.

This is the crux of the case. Plaintiff in his later arguments has attempted to minimize the importance of Wainhouse's citizenship and his status as employee or independent contractor by relying on the argument and the cases which have to do with plaintiff's rights as owner of the copyrighted works—which defendants do not dispute—as contrasted with its right initially to secure the copyright. That there is no connection between the legal right to secure a copyright and the property in the material copyrighted is clear from the statute. Section 27 specifically distinguishes between the two. The cases cited by plaintiff in this connection to the effect that whether one is an employee or an independent contractor is not determinative of ownership, are not relevant. The question is of paramount importance in determining, however, who is the person entitled to secure the copyright especially under the statutes in question, and we turn, therefore, to consider the evidence which plaintiff has adduced in support of its position that Wainhouse was a mere employee for hire—and not an independent writer qualifying as the author of the works in question. Obviously, if plaintiff cannot on this motion show sufficient likelihood of succeeding in establishing its right to secure the copyrights and their validity, it may not secure the injunction.

On his deposition, plaintiff's president, Girodias, admitted that he knew Wainhouse to be an American, although he did not know whether he was a citizen or not. It is clear that he knew him to be a resident of France for many years, married to a French woman, so he probably did not consider him an American domiciliary, but an American citizen. Their association—an apparently warm friendship—appears to have lasted over many years.

The plaintiff has stated in answer to defendants' interrogatory that there was no written agreement entered into between plaintiff and Wainhouse relating to the translation by Wainhouse for "The Story of Juliette". Wainhouse, in an affidavit given by him to defendants, sworn to before the American Consul at Nice, on January 20, 1967, agrees with this admission of plaintiff, stating that when "requesting a contract of the customary sort between publisher and translator, Girodias assured me that no con-

tract need be established between us for the pure and simple reason that 'contracts are always made to be broken.'" His affidavit also recites that he is an American citizen, that he graduated from Harvard in 1948 (English and Comparative Literature, A.B., Magna cum laude, Phi Beta Kappa); was an instructor of English in a Pennsylvania college for one year, a graduate student in a mid-west college during the following year, went to France in 1950 to pursue research toward a thesis and has resided abroad ever since, save only for occasional trips (three since 1958) to the United States. In support of his position that he was not a hired writer but an independent author, he relates that he began his translations of Sade in 1952, at which time he had completed an essay of his own on Sade, had translated into French "La Phylosophie dans le Boudoir"; that it was this completed text that he presented to Maurice Girodias at the time of their first meeting in March, 1953, and that it was this text, unaltered and "integral", that plaintiff published in May, 1953, under the title of "The Bedroom Philosophers", for which Girodias paid him by check seventy five thousand francs ($200.00 approximately). Wainhouse further states that he worked on his translations in cafes, at his home and at the homes of his parents in Vienna and Washington, but "never at any time on the premises of the Olympia press." He is positive in his statement that in the majority of the instances he proposed that a translation be made and the work published, that no editing whatsoever was done upon any of his translations and that Girodias exerted absolutely no control over their style and content; and that he, Wainhouse, selected and used his own pseudonym for purely personal reasons. He swears that, concerning payment, it was from the first and last, agreed that payment in full was to be made upon submission of the finished text; royalty considerations, at Girodias' repeated insistence, being deferred again and again.

Plaintiff, in its insufficient supporting affidavit, says that it engaged Wainhouse and commissioned the work for hire in return for a set fee of 300,000 francs per volume. This equivocal language, coupled with the vague reference to an oral agreement, the terms of which are not set forth, certainly do not support the naked conclusion that Wainhouse was an employee for hire. Quite to the contrary, the correspondence from Wainhouse to Girodias, beginning early in 1957, speaks of how much Wainhouse was "to charge" plaintiff, of the difficulty of obtaining a lump sum payment from plaintiff in the past and of Wainhouse's need to receive periodic payments from plaintiff in order to be paid at all— the amount of which Wainhouse set (not Girodias) and called a "salary"—and of his demands for royalties. It appears from these also that Wainhouse chose the titles of the works, wrote the blurbs for the Juliette books, that he procured the typing at his own expense and that, prior to his hiring, he had completed the translation of Volume I of the Juliette series, suggested manuscripts for translation to Girodias and submitted unsolicited translations for Girodias to try to have published for him.

The tenor of these letters bespeaks much more two independent men working together—one as author, the other as publisher—rather than employer and hired hand. See Donaldson Pub. Co. v. Bregman, Vocco & Conn, Inc., C.A.2, 375 F.2d 639, 3/24/67, #30367. What followed evidences a recognition by plaintiff of the difficulty, if not the impossibility, of having the works copyrighted if the above facts were disclosed to the Copyright Office. In the first place, the long delay in applying for copyright protection by one engaged in the publishing business indicates a realization that copyright would not lie. By contrast with respect to the last two volumes, also translated by an American citizen, plaintiff did not delay for, by letter of Girodias to the Register of Copyright dated August 24, 1965, he filed two ad interim copyright applications for the English

version of Volumes VI and VII, stating that these volumes had been translated by John Crombie, an American citizen. Girodias' letter also informed the Register that:

"The first five volumes as published by our company (which company is registered in France) have been translated into the English language by Pieralessandro Casavini who is not a citizen of the U.S.A. and we therefore consider that these five volumes are protected by the U.C.C.".

The letter continued that plaintiff had bought the translations of Crombie for a set fee "and it seems therefore that our company should be granted the privilege of authorship on these two volumes." No claim was then made by plaintiff of any right to copyright "under the privilege of authorship" in the five volumes translated by Wainhouse, by reason of payment to Wainhouse of a "set fee". It is apparent also that plaintiff's reference to Wainhouse under the pen name "Pieralessandro Casavini" was done with the purpose of lending the support of a foreign name to plaintiff's statement that the author of the translation of the first five volumes (Wainhouse) was not an American citizen.

It is evident from a letter from the Register of Copyrights, dated October 8, 1965, addressed to plaintiff, that plaintiff was fully advised of the provisions applicable to an English language book manufactured and published outside the United States and authored by a United States citizen or domiciliary for it called attention to the importance of "the status of authorship" as follows:

"If Mr. Crombie was employed for the purpose of translating these works, the citizenship of the author would be that of the employer. In this event, full term (28 years) copyright would be possible under the provisions of the Universal Copyright Convention, application being made on Form A–B Foreign.

"On the other hand, if Mr. Crombie was not employed for the purpose of translating these works, but the com-pleted translations being bought later, Mr. Crombie would appear to be the author and ad interim registration appropriate."

The reply of Girodias, claiming registration by the company because Crombie had "been employed for that work against payment of a fee" and his very vague reference to the publication of the first five volumes without any mention of authorship or dates, reveals plaintiff's full understanding of the copyright requirements and of what he could not disclose regarding those five volumes if he was to obtain a copyright. Still Girodias' restrained disclosure of the details of Crombie's employment did not satisfy the Register and, in a long, informative letter, the latter requested further clarification of this crucial detail, giving its reasons for its importance. With all the pitfalls of the problem pointed out to Girodias by the Register (even going so far as to instruct him on judicial application and interpretation of the statute, and the statement that it was its policy to leave it up to the applicant rather than to the Copyright Office to determine whether a work "was made for hire" on a particular case, and, because of its crucial importance, suggesting that Girodias might want to explore this difficult and important problem further) it did not take Girodias too long to proceed with the claim that the author of Volumes 2 through 4 was not Casavini, or Wainhouse, but OLYMPIA, and that this was so because of the special terms of Wainhouse's employment by OLYMPIA, omitting all reference to the role played by Wainhouse or even to his existence!

Even plaintiff's attempt to explain its sudden spurt of activity in securing the four copyrights after such a passage of time, falls far short of the facts. The explanation given that it was negotiating with an American publishing company for the publication of various works and knew that its rights to "Juliette" was one of its most important assets, is belied by its refusal or inability to produce any evidence in this respect, and by the

fact that any such negotiations apparently began and were dissolved long before the procurement of the copyrights.

Because we conclude that there is serious question as to the validity of the copyrights in suit, an injunction will not lie and it is unnecessary to discuss the defenses of laches and absence of irreparable harm.

Motion denied; so ordered.