**PICTURE MUSIC, INC., Plaintiff,**

v.

**BOURNE, INC., Defendant.**

No. 64 Civ. 3295 (MP).

United States District Court,
S. D. New York.

July 6, 1970.

**642**

Lewis A. Dreyer, New York City, for plaintiff; by Lewis A. Dreyer and Norma Hack, New York City, of counsel.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City, by Walter S. Beck and Robert R. Salman, New York City, of counsel.

## OPINION

POLLACK, District Judge.

This action seeks to determine the ownership of copyright interests, original and renewal, in a popular song and to obtain an accounting in respect thereof.

In May, 1933, Walt Disney Productions, Inc. (hereafter "Disney") produced, copyrighted and released a motion picture musical cartoon entitled the

"THREE LITTLE PIGS" which enacted the fable of the two heedless pigs who built their houses of straw and sticks but were saved from the huffing, puffing wolf by the third pig's house of brick. In the cartoon was a simple musical composition, a verse sung by each pig stating its choice of its kind of house, followed by a refrain consisting of repetitions of all or part of the line, "Who's Afraid of the Big Bad Wolf?". The composition was a lyric set to music. The words and music were written by Disney's employee, a pianist, Frank E. Churchill.

The cartoon was exhibited at various motion picture houses in New York City and was a notable success. George E. Joy, the professional manager of Irving Berlin, Inc., heard the tune and conceived the notion that it could be a hit as a popular vocal song. He communicated his idea to Miss Ann Ronell, a successful songwriter, some of whose works were being published by the Berlin organization, and to Johnny Burke, a lyric writer who was under contract to Berlin. He took both of them to the Trans Lux Theatre in New York City where they saw and heard the Disney musical cartoon. Joy told them in effect that he wanted the musical composition in the motion picture adapted for use as a popular song. This required restructuring and lengthening the central melody to the customary proportions for a popular song and supplying incidental necessary musical changes and additional lyrics to accomplish this. Joy apparently felt that Miss Ronell was under some obligation to help him because he had recently taken one of her songs to Paul Whiteman, the famous band leader, who introduced it to the public for her. He explained: "We were quite friendly, and in those days you didn't think much of asking another writer to help you out and fix up a middle or punch line." Sometimes, he noted, the assistance was free of charge, and "sometimes for a few dollars."

The musical score of the cartoon was obtained by the Berlin organization and

furnished to Miss Ronell. She worked on it with Johnny Burke at the Berlin offices as well as by herself at home. The music was adapted by them for use as a popular song, lyrics were added by Miss Ronell and the product was submitted to Joy who directed that it be gone over by the Berlin music editor and arranger, Helmy Kresa; the latter went over it, made suggestions and inserted certain revisions thereon. The result was then forwarded to Disney by the Berlin organization through one Kay Kamen, the New York agent for Disney.

Disney agreed to permit the publication of the song by Berlin and assigned its ownership interest and the right to apply for copyrights, original and renewal, to Berlin, in exchange for agreed royalties. Disney also executed a written assignment to Miss Ronell for her services, of one-fourth of Disney's royalty income from the song. The song became a popular success almost immediately.

The Berlin organization published the first edition of the song sheet with the credit that the "Words and Music [were] By Frank E. Churchill and Ann Ronell". Whether this was merely reciprocal appreciation for her help is not clear but at all events the credits overshot the mark. However, the later editions of the song sheet were published with a modified legend reading "Words and Music by Frank E. Churchill, Additional Lyric by Ann Ronell". This modification was prompted by the complaints of the writers on Disney's staff who had collaborated in making the cartoon. They had complained of the credit given to her for what she had done with the work and demanded that they should be given public artistic recognition for their contributions to the works on which they were employed. Disney met the discontent in his organization by causing the modification of the legend on the popular song sheets. Ann Ronell protested the change, but to no avail. She also complained that her understanding was that she would receive one-third of the royalty income and not merely one-fourth thereof, and there is some support from the Berlin organization for her contention. Again, she was unable to gain her point; Disney refused to pay more than one-fourth. She was represented during this period and in this connection by experienced independent counsel as well as by her brother, an outstanding lawyer, both of whom she consulted in respect of her rights and interests and both of whom presented her viewpoint to Berlin and/or Disney.

The 25% share of Disney's royalty income was paid to Miss Ronell semi-annually during the next 27 years for the period from 1933 until 1960 when applications for renewal copyrights on the song became timely. Although she demurred in the early years, ultimately she accepted every royalty payment so calculated. From 1960 she declined to receive her share of royalties on a newly asserted ground and the royalties payable to her have been accumulated by the defendant for her. In a letter to the defendant prepared for her by new counsel, Miss Ronell claimed an ownership interest in the last year of the original copyright together with an undivided one-half interest in the renewal copyright as well as the right as an owner to designate the music publisher. She assigned her alleged rights to Ross Jungnickel, Inc., which in turn assigned to the plaintiff. She filed renewal copyright claims in September, 1960 and obtained registration certificates. In about 1961, the plaintiff published a new edition of the song under its own name. This has given rise to the defendant's counterclaim for infringement.

In addition to sharing Disney's income from royalties on the sale of sheet music, Miss Ronell has also received performance benefits from her connection with the popular song through her membership in ASCAP (American Society of Composers, Authors & Publishers). The latter is an unincorporated membership association comprising publishers, authors and composers who own interests in various sep-

arate musical compositions. ASCAP functions as a licensing agent for its members. When someone in the professional entertainment field wants to perform a copyrighted piece, he merely secures a license from ASCAP rather than seeking out the individual publisher or writer whose work he wants to perform. ASCAP collects a fee or royalty for the license, which is divided equally between the publisher and the writers; this is periodically paid over to them. *Cf.* K–91, Inc. v. Gershwin Publishing Corp., 372 F.2d 1, 2 (9th Cir. 1967), cert. denied, 389 U.S. 1045, 88 S.Ct. 761, 19 L.Ed.2d 838 (1968). These performance fruits are distributed in this manner as an incident of the agreement among ASCAP members.

In this case the writer's share was split equally between Churchill and Ronell; each thus received one-fourth of the receipts collected by ASCAP and that has been paid to them since 1933. This fact has no significance on the question in this case of the ownership of the copyright interests, original or renewal. The publisher's share of the performance receipts was paid by ASCAP to Berlin (later Bourne) through September 7, 1961 and from that date until June 30, 1962 the publisher's share was divided and paid 50% to Bourne and 50% to plaintiff, Picture Music, Inc. Thereafter, this division was terminated and Bourne was credited by ASCAP with the full publisher's share as a result of furnishing ASCAP with a letter of indemnification. These facts too, have no bearing on the decision of the issue in this case as to the ownership of the renewal copyrights.

Both plaintiff and defendant agree that defendant owns at least a one-half interest in the United States renewal copyright of the song. Defendant, however, claims ownership of the entire renewal copyright, while plaintiff, as assignee of Ann Ronell, claims ownership of a one-half interest. Plaintiff's claim derives from the asserted co-authorship of Miss Ronell. Defendant maintains that Miss Ronell's contribution cannot be deemed an authorship and that, in any event, her contribution was made in the course of an employment for hire.

By its first claim for relief, plaintiff seeks a declaration that it held the ownership of a one-half interest in the final year of the original term of the United States copyright and holds a like interest in the United States renewal copyright of the song. By the second claim for relief, plaintiff seeks a similar interest as to foreign copyrights of the song. An accounting is demanded of one-half of all moneys and benefits received by defendant for the use and licensing of the song from and after April 1, 1960.

Defendant, in a counterclaim, seeks, *inter alia,* to enjoin plaintiff's alleged infringement of defendant's copyright interest in the song, and seeks an accounting of the profits derived by plaintiff from such infringement together with counsel fees. Plaintiff denies infringement on the contention that it is a co-owner of the renewal copyright interest.

It has been stipulated that all issues relating to an accounting, damages and relief for infringement shall not be considered upon the main trial of this action, but shall be held in abeyance for subsequent adjudication, if the parties are unable to agree as to those matters.

The sole issue now to be decided, therefore, is the issue of title.

■ Copyright may be secured for two successive periods of 28 years, original and renewal periods, for a total of 56 years of protection. 17 U.S.C. § 24. If the author lives into the 28th year of the original period, the renewal copyright, a distinct and separate estate from the original term, vests in him. He may, of course, dispose of the renewal by contract before or after the renewal term commences.

The plaintiff contends that Ann Ronell worked on the song as an independent contractor, that her contribution to the song was original, substantial and copyrightable, that the song is to be considered a joint work of hers with Frank

E. Churchill which entitled her to an undivided one-half interest in the renewal copyright of the song and that she did not convey this interest to the defendant or to Disney.

The first of these contentions to be discussed is whether Ronell became a joint owner of the popular song and as such is entitled to an undivided half interest thereof.

█ Joint authorship gives rise to joint ownership of a copyright.

The doctrine of joint authorship is nowhere referred to in the basic federal copyright enactment, Title 17 U.S.C., which derives from the Copyright Act of March 4, 1909, 35 Stat. 1075. Rather, it is one of judicial creation which was imported wholesale from English Law by Judge Learned Hand. *See,* Maurel v. Smith, 220 F. 195 (S.D.N.Y. 1915), aff'd, 271 F. 211 (2d Cir. 1921), citing Levy v. Rutley, L.R. 6 C.P. 523 (1871). *See generally* Cary, "Joint Ownership of Copyrights", in 1 Studies on Copyright 689 (1963); M. Nimmer, Copyright ch. 6, at 270 (1969); H. Howell, Copyright Law, at 51, 73, 120 (Latman ed. 1962); S. Rothenberg, Legal Protection of Literature, Art and Music ch. VIII, at 132 (1960).

When two or more authors pursuing a common design together create a single work, they become joint owners of the work in undivided shares which are owned by each author. Maurel v. Smith, *supra;* Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F.2d 266 (2d Cir. 1944); Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 161 F.2d 406 (2d Cir. 1946), cert. denied, 331 U.S. 820, 67 S.Ct. 1310, 91 L.Ed. 1837 (1947) (hereinafter, the "Melancholy Baby" case); Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569 (2d Cir.), modified on rehearing, 223 F.2d 252 (2d Cir. 1955) (hereafter, the "12th Street Rag" case).

Traditionally, joint authorship contemplated collaboration by the authors of the parts and a common purpose. Thus, in Maurel v. Smith, *supra,* three artists who contributed, respectively, the scenario, libretto and lyrics to a single work intended for operatic performance were held to be joint authors. The collaboration in that case was virtually coincident in point of time and the authors were found to have agreed upon a general design and structure. 271 F. at 215.

However, in later cases the ingredient of collaboration was eliminated on a finding of a fusion of effort. In the Edward B. Marks case, *supra,* 140 F.2d 266, a lyricist sold the words for a song to a publisher who, without the lyricist's knowledge, engaged a composer to set the words to music and copyrighted the product. The Court, *per* Learned Hand, J., found that the lyricist had intended the words to be set to music and that the composer was writing music to be used with those particular words, and found in the circumstances "a joint laboring in furtherance of a common design." 140 F.2d at 267, quoting Levy v. Rutley, L.R. 6 C.P. 523, at 529. The Court observed that

> It makes no difference whether the authors work in concert, or even whether they know each other; it is enough that they mean their contributions to be complementary in the sense that they are to be embodied in a single work to be performed as such. 140 F.2d at 267.

The "Melancholy Baby" case, *supra,* concerned a musical composition consisting of music written by a husband and lyrics by his wife. The work was copyrighted as an unpublished work and taken to a publisher who approved the music but rejected the lyrics. The publisher engaged a second lyricist to write new words and the product was published and copyrighted. The Court held the resultant composition a "joint work" and the product of a "joint authorship" notwithstanding that the composer of the music had originally intended his product to be joined with his wife's lyrics. The Court concluded that

> The words and music of a song constitute a "musical composition" in which the two contributions merge into a

single work to be performed as a unit for the pleasure of the hearers; they are not a "composite" work, like the articles in an encyclopedia, but are as little separable for purposes of the copyright as are the individual musical notes which constitute the melody. 161 F.2d at 409.

In the "12th Street Rag" case the element of common design was still further diluted, if not altogether eliminated. There an instrumental piano solo copyright was assigned to a music publisher. The publisher employed a lyricist who wrote lyrics as a special job assignment and the resultant work was copyrighted. The Court rejected the view that the composer of the music must have intended at the time of his composition that lyrics be added later before a joint authorship could arise. It held that the intent of the assignee, rather than that of the author, should govern, and that the former had intended "to merge the two contributions into a single work to be performed as a unit for the pleasure of the hearers * * *." 221 F.2d at 570. Treating the work as a "composite" one, the Court reasoned, "would leave one of the authors of the 'new work' with but a barren right in the words of a worthless poem, never intended to be used alone," a result "not to be favored." *Id.*

Commentators have sharply criticized the "12th Street Rag" doctrine. One has noted,

[N]o longer does there seem to be required a preconcerted common design or any active collaboration. It is now sufficient if there be any "fusion of effort" in the creation of a revision, adaptation or modification of any existing work. The authors of the original work are not required to have any knowledge of the modification, nor do they have to take part in it. Any action on the part of their transferees which utilizes the preexisting work in the creation of a new version thereof is sufficient to make the original creators joint authors with those who later revise their work. Not only does

this extension of the joint author concept do violence to the renewal policy of the law, but it would appear to extend, for an indefinite period, the control of the original author over any subsequent revision of his work. Cary, *supra*, at 696.

Nimmer suggests that the "fusion of effort" doctrine subverts the division of rights in a derivative work established under 17 U.S.C. § 7 and causes the following anomalous results:

(1) the creator of a derivative work obtains the right to exploit such work for the entire term of its copyright even if his license from the owner of the underlying work terminates prior thereto; (2) the owner of the underlying work may claim ownership in the derivative work even after the underlying work has entered the public domain. Nimmer, *supra*, § 73.2, at 281.

Suggested statutory revisions of the copyright law, would define a "joint work" as one "prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole," expressly overruling the "12th Street Rag" doctrine. *See* P. Wittenberg, The Protection of Literary Property 67 (1968).

■ It is clearly established that where a truly "joint work", is created, each co-owner is akin to a tenant in common. Silverman v. Sunrise Pictures Corp., 273 F. 909 (2d Cir. 1921), cert. denied, 262 U.S. 758, 43 S.Ct. 705, 67 L. Ed. 1219 (1923); Denker v. Twentieth Century-Fox Film Corp., 10 N.Y.2d 339, 223 N.Y.S.2d 193, 179 N.E.2d 336 (1961); Noble v. Van Nostrand Co., Inc., 63 N.J.Super. 534, 164 A.2d 834 (1960). Accordingly, a joint author cannot be held liable for copyright infringement to another joint owner, Richmond v. Weiner, 353 F.2d 41 (9th Cir. 1965), cert. denied, 384 U.S. 928, 86 S.Ct. 1447, 16 L.Ed.2d 531 (1966); compensation obtained from the unilateral exploitation of the joint work by one of the co-owners without the permission of the others

is held in a "constructive trust" for the mutual benefit of all co-owners and there is a duty to account therefor. Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569 (2d Cir.), modified on rehearing, 223 F.2d 252 (2d Cir. 1955).

■ No joint ownership arose here. There was no collaboration between Frank E. Churchill, the author of the source material, and Ann Ronell. Neither Churchill nor his employer, Disney, intended to create a new work. Miss Ronell's contribution to the work which she undertook with Berlin's employees was not a new version of the music or lyrics. Even if her additions were copyrightable, and this is shrouded in doubt, a more substantial and significant contribution was required to reach a finding of joint ownership. *But cf.* Bleistein v. Donaldson Lithographing Co., 188 U. S. 239, 23 S.Ct. 298, 47 L.Ed. 460 (1903).

It was not the intention of the parties that Miss Ronell should become a joint owner of the source material or of the popular song so closely derived therefrom. The original work was not transferred to her. At most, she provided only certain musical changes in the same musical composition which were not a significant contribution or change, except in musical style, of the original source material; and she added lyrics in the same vein as the original lyrics.

The plaintiff further contends that Miss Ronell owned a renewal copyright interest in the song at all events as the beneficiary of purposes of the Copyright Act which vest in an author a second chance to negotiate for the fruits of her work. It becomes useful then to examine the relevance of this doctrine when services have been applied to source material furnished by the original author.

■ Section 24 of 17 U.S.C. provides for a "renewal and extension" of copyrights "for the further term of twenty-eight years when application for such renewal and extension shall have been made to the copyright office and duly registered therein within one year prior to the expiration of the original term of copyright," by stated classes of beneficiaries subject to prescribed conditions. Analysis of the legislative history of the enactment indicates that the renewal term was designed for the twin purposes of benefitting the author and regulating the term according to the commercial value of the work. *See* Ringer & Culp, "Renewal of Copyright," in 1 Studies on Copyright 503, at 517 (1963).

■ Nonetheless, it has been dispositively held that authors can effectively yield their renewal expectancy prior to its vesting. An assignment of the expectancy entitles an assignee to the renewal copyright, Fred Fisher Music Co. v. M. Witmark & Sons, 318 U.S. 643, 63 S.Ct. 773, 87 L.Ed. 1055 (1943), absent circumstances rendering the assignment unconscionable. Rossiter v. Vogel, 148 F.2d 292 (2d Cir. 1945).

In the *Fred Fisher* case the Supreme Court specifically declined "to recognize that authors are congenitally irresponsible, * * * and therefore assignments made by them should not be upheld." 318 U.S. at 656, 63 S.Ct. at 779. Mr. Justice Frankfurter, writing for the Court, noted:

It is not for courts to judge whether the interests of authors clearly lie upon one side of this question rather than the other. If an author cannot make an effective assignment of his renewal, it may be worthless to him when he is most in need. Nobody would pay an author for something he cannot sell. We cannot draw a principle of law from the familiar stories of garret-poverty of some men of literary genius. Even if we could do so, we cannot say that such men would regard with favor a rule of law preventing them from realizing on their assets when they are most in need of funds. Nor can we be unmindful of the fact that authors have themselves devised means of safeguarding their interests. We do not have such assured knowledge about authorship, and particularly about song writing, or the psychology of gifted writers

and composers, as to justify us as judges in importing into Congressional legislation a denial to authors of the freedom to dispose of their property possessed by others. While authors may have habits making for intermittent want, they may have no less a spirit of independence which would resent treatment of them as wards under guardianship of the law. 318 U.S. at 657, 63 S.Ct. at 779.

■ Whether an assignment is construed to convey renewal rights as well as the original term of copyright is a question of fact which hinges on the intent of the parties; and the issue is to be decided from the attendant facts and circumstances. Rossiter v. Vogel, 134 F.2d 908 (2d Cir. 1943); Venus Music Corp. v. Mills Music, 261 F.2d 577 (2d Cir. 1958). Furthermore, "the circumstances justifying the transfer of the right of renewal must be stronger than those justifying the transfer of the copyright * * *." Rossiter v. Vogel, 134 F.2d at 911; Shapiro, Bernstein & Co. v. Bryan, 123 F.2d 697, at 700 (2d Cir. 1941).

It has been held that a general transfer by an author of the original copyright without mention of renewal rights conveys no interest in the renewal rights without proof of a contrary intention. G. Ricordi & Co. v. Paramount Pictures, Inc., 189 F.2d 469 (2d Cir.), cert. denied, 342 U.S. 849, 72 S.Ct. 77, 96 L.Ed. 641 (1951); Edward B. Marks Music Corp. v. Charles K. Harris Music Publishing Co., 255 F.2d 518 (2d Cir.), cert. denied, 358 U.S. 831, 79 S.Ct. 51, 3 L. Ed.2d 69 (1958).

■ On the other hand, a trial court may infer from the acts of the parties and the surrounding circumstances an intention to convey renewal rights by general words or acts of assignment. Venus Music Corp. v. Mills Music, 261 F.2d 577 (2d Cir. 1958). An agreement to make royalty payments for an indefinite period on moneys accrued from the exploitation of copyrights and the acceptance of such payments are factors which may be considered in determining whether delivery of an artist's product carried renewal rights. Rose v. Bourne, Inc., 176 F.Supp. 605, 611–612 (S.D.N.Y.1959), aff'd, 279 F.2d 79 (2d Cir.), cert. denied, 364 U.S. 880, 81 S.Ct. 170, 5 L.Ed.2d 103 (1960).

It has been suggested [and it is claimed herein] that the most compelling rationale for the renewal protection is that the original assignment of rights by authors to publishers frequently is made "at a time when the value of the work is unknown or conjectural and the author (regardless of his business ability) is necessarily in a poor bargaining position." Ringer, supra, at 521; Nimmer, supra, § 113 at 462. However, Nimmer has recognized that "[t]his reasoning is somewhat less persuasive when the original sale is on a percentage royalty basis so that the author automatically shares in whatever returns his work may bring." Id. The purpose to give a second chance to an improvident author disappears when a substantial royalty is the compensation arranged—it goes for the life of the commercial value of the property.

It follows that the concept for which a renewal term is carved out for an artist may be considered in determining whether a particular transfer of rights comprehended the renewal as well as the original copyright interests.

The defendant contends further that an employment for hire relationship existed between Disney-Berlin and Ann Ronell and the product of her services was thus purchased by and became the property of Disney (respectively Berlin).

Section 24 of 17 U.S.C. inter alia provides that "in the case of * * * any work copyrighted * * * by an employer for whom such work is made for hire, the proprietor of such copyright shall be entitled to a renewal and extension of the copyright in such work for the further term of twenty-eight years" upon due and timely application in the final year of the original term. Thus, it is crucial in determining renewal rights to define the relationship be-

tween the author and any publishing company to whom he may have ceded rights in the original copyright term.

■ If the relationship is one of employment, then the renewal rights vest in the employer or his successor in interest absent any contrary agreement, Shapiro, Bernstein & Co. v. Bryan, 123 F.2d 697 (2d Cir. 1941); Von Tilzer v. Jerry Vogel Music Co., 53 F.Supp. 191 (S.D.N.Y.1943), aff'd sub nom. Gumm v. Jerry Vogel Music Co., Inc., 158 F.2d 516 (2d Cir. 1946); Fred Fisher Music Co. v. Leo Feist, Inc., 55 F.Supp. 359 (S.D.N.Y.1944), and provided the particular work was made pursuant to the relationship and not as a special assignment outside of the regular scope of employment. Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 115 F.Supp. 754 (S.D.N.Y.1953), rev'd on other grounds, 221 F.2d 569 (2d Cir.), modified on other grounds, 223 F.2d 252 (2d Cir. 1955); Eliscu v. T. B. Harms Co., 151 U.S.P.Q. 603 (N.Y.Sup.Ct., N.Y. County 1966).

On the other hand, the rights vest in the author, not the proprietor, if the author was a commissioned independent contractor, Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 221 F.2d 569 (2d Cir.), modified on other grounds, 223 F.2d 252 (2d Cir. 1955); T. Kupferman, "Renewal of Copyright," 44 Colum.L. Rev. 712, 716 (1944); B. Varmer, "Works Made for Hire and On Commission", in 1 Studies on Copyright 717, 722 n.7 (1963); M. Nimmer, Copyright § 114.4, at 470 (1969), or if any of the ingredients of the employment relationship are lacking, Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639 (2d Cir. 1967), cert. denied, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968). But cf. Brattleboro Publishing Co. v. Winmill Publishing Corp., 369 F. 2d 565 (2d Cir. 1966), holding that the "works for hire" doctrine is applicable where the parties bear the relationship of employer and independent contractor. Also see Lin-Brook Builders Hardware v. Gertler, 352 F.2d 298 (9th Cir. 1965), which holds that absent an express contractual reservation of copyright in an artist engaged as an employee or independent contractor, the presumption arises that the mutual intent of the parties is that title to the copyright shall be in the person at whose instance and expense the work is done.

■ In spite of the importance of the distinction, however, the law is unclear as to precisely what constitutes an employment for hire. See M. Nimmer, Copyright § 62.2, at 238.2 (1969).

The legislative history of the provision entitling proprietors of "works made for hire" to renew in their own right is hardly enlightening in this regard. See Ringer, "Renewal of Copyright," in 1 Studies on Copyright 503, at 533 (1963). Discussions during a revision conference held by the Librarian of Congress in 1906 prior to the enactment of the 1909 Act indicate that the provision was included in the draft bills at the behest of two groups: the publishers of encyclopedias, directories and other composite works and the publishers of prints and similar works of graphic arts. Id. These publishers wished to insure their right to secure copyrights in material composed by their staffs without having to obtain their employees' assignments.

In the early drafts of the Act, which contemplated a single copyright term for the life of the author plus fifty years, a special term of fifty years' duration was given to composite works, works copyrighted by a corporate body and works made for hire. Ringer, supra, at 534. This, apparently was done because of the impracticality of basing copyright terms on the life of corporate employers and because of the propriety of affording employers a shorter term of protection than the actual creators. Ultimately, however, the life-term concept was eliminated from the statute. The language giving a special term to works copyrighted by employers for hire was imported intact into the provision giving proprietors renewal in their own right. As one commentator notes

The committee reports on this final bill indicate a likelihood that the legislators regarded a "work made for hire" as a species of "composite or cyclopedic work," and did not realize the breadth of the exception they were creating. Ringer, *supra*, at 534–35.

The case law is similarly unhelpful in articulating the constituent elements of an employment for hire or the rationale underlying the provision. Two cases in this Circuit provided the initial construction of the "employer for hire" renewal provisions of the Act of March 4, 1909, c. 320, 35 Stat. 1080.

Tobani v. Carl Fischer, Inc., 98 F.2d 57 (2d Cir.), cert. denied, 305 U.S. 650, 59 S.Ct. 243, 83 L.Ed. 420 (1938) construed a section (§ 24 of the 1909 Act, repealed by § 2 of Act of July 30, 1947, c. 391, 61 Stat. 652) pertaining to works copyrighted before 1909; Shapiro, Bernstein & Co. v. Bryan, 123 F.2d 697 (2d Cir. 1941) interpreted a section (§ 23 of the 1909 Act, now 17 U.S.C. § 24) relating to copyrights secured after 1909. Both cases held that the claims of employers for hire prevail over those of authors, their families or their representatives.*

Shapiro, Bernstein & Co. v. Bryan, *supra*, also made it clear that the copyright proprietors at the time of renewal —not the original employers—are entitled to the second term.

Shapiro, Bernstein & Co. v. Bryan, *supra*, recognized the difficulty of reconciling the rationale underlying the renewal term with the exception for works made pursuant to an employment for hire. In particular, the Court noted the discrepant treatment of assignees and employers:

> It is of course true that since the right of renewal is quite separate from the original copyright, circum-

stances which might be enough to imply its transfer—e. g. working for wages—might not be enough to imply a transfer of the right of renewal. We assume arguendo for instance that the assignee of the literary property in an unpublished work, who later takes out the copyright, like the assignee of the copyright itself, does not get the renewal; it might have been reasonable therefore to save out of the transfer by contract of employment cases where the employee was the real author, as here. 123 F.2d at 700.

The Court went on to reason, however, that the language of the statute dictated the distinction and that any construction other than the obvious one would fly "in the teeth of the statute."

In spite of the absence of a conceptual basis for the distinction, certain objective indicia may be noted in the cases finding an employment for hire, and in those declining to do so.

Indicative of an employment for hire are the following:

(1) The existence of an arrangement going beyond an assignor-assignee relationship prior to the undertaking of the particular work. Ringer, *supra*, at 537. The antithesis of such an arrangement is a case where an author creates a work of his own volition and then sells it to a proprietor, *Id.*; T. Kupferman, "Renewal of Copyright," 44 Colum.L.Rev. 712, 716 (1944); Olympia Press v. Lancer Books, Inc., 267 F.Supp. 920, 924 (S.D.N.Y.1967). Such a work has been called a "spontaneous" product. Tobani v. Carl Fischer, Inc., 36 U.S.P.Q. 97 (S.D.N.Y.1937), modified on other grounds, 98 F.2d 57 (2d Cir.), cert. denied, 305 U.S. 650, 59 S.Ct. 243, 83 L.Ed. 420 (1938). This consideration has also been spoken of under parallel provisions of English law as "the master's power

---

* Although the result of the two cases was the same, the grounds for the respective decisions differed. *Tobani* read into the provisions dealing with the renewal of subsisting copyrights the language of what is now 17 U.S.C. § 26, which provides that the word "author" shall include an employer in the case of works made for

hire. *Shapiro, Bernstein & Co.* declined to import that same language into the section governing renewals of work copyrighted after 1909, reasoning that such a construction would lead to absurdities. Instead, the latter case relied on the specific language of what is now 17 U.S.C. § 24.

of selection of his servant." W. Copinger & F. E. & E. P. Skone James, Copyright § 326, at 130 (1965).

■■■ (2) The payment of wages or other remuneration. Copinger & Skone James, *supra*. A regular salary is an important indicant of employment, Ringer, *supra*; Von Tilzer v. Jerry Vogel Music Co., 53 F.Supp. 191 (S.D.N.Y. 1943), aff'd sub nom. Gumm v. Jerry Vogel Music Co., 158 F.2d 516 (2d Cir. 1946), but the salary need not be fixed and has often been in the form of advances against future royalties, if any. M. Nimmer, Copyright, § 62.2, at 238.2–239 (1969); Tobani v. Carl Fischer, Inc., *supra*; Shapiro, Bernstein & Co. v. Bryan, 123 F.2d 697 (2d Cir. 1941); Fred Fisher Music Co. v. Leo Feist, Inc., 55 F.Supp. 359 (S.D.N.Y.1944). It has been said that one may be an employee even if the writing is done as an accommodation with no compensation at all. Nimmer, *supra* at 238.2, citing Lawrence v. Dana, 15 Fed.Cas. p. 26 (No. 8136) (C.C.D.Mass.1869). Thus, neither the form of compensation, nor the amount, if any, is determinative. Conversely, the fact that the author was obliged to repay advances on royalties which were never accrued is an indicant that the relationship was not an employment for hire. Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., 375 F.2d 639 (2d Cir. 1967), cert. denied, 389 U.S. 1036, 88 S.Ct. 768, 19 L.Ed.2d 823 (1968), reversing 253 F.Supp. 841 (S.D.N.Y.1965).

(3) The right of the employer to direct and supervise the manner in which work is performed. Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., *supra*; Olympia Press v. Lancer Books, Inc., *supra*; Rytvoc, Inc. v. Robbins Music Corp., 289 F.Supp. 136 (S.D.N.Y. 1967); Copinger & Skone James, *supra*; M. Nimmer, Copyright § 62.2, at 238.2–239 (1969). This indicant has been called "crucial". Nimmer, *supra*. Courts have noted whether the author's work was edited by his employer and whether control was exerted over the style and content of the work. Olympia Press v. Lancer Books, Inc., *supra*.

(4) The existence of an express contract for hire, especially one calling for an author to devote his exclusive artistic services to his employer, Tobani v. Carl Fischer, Inc., *supra*; Shapiro, Bernstein & Co. v. Bryan, *supra*; Fred Fisher Music Co. v. Leo Feist, Inc., *supra*, or requiring him to execute special contracts in connection with all works created which assign his copyright interest. Fred Fisher Music Co. v. Leo Feist, Inc., *supra*. By contrast, an author's freedom to engage in outside writing activities from which he derives substantial independent income is indicative of the absence of an employment for hire notwithstanding the use of the word "employment" in an agreement with the writer. Donaldson Publishing Co. v. Bregman, Vocco & Conn, Inc., *supra*.

(5) Regular working hours. Von Tilzer v. Jerry Vogel Music Co., *supra*. This factor has been expressly declared a non-essential ingredient of the employment relationship, however. Tobani v. Carl Fischer, Inc., *supra*.

(6) The fact that the creative work occurred in whole or in part at the employer's place of business. Von Tilzer v. Jerry Vogel Music Co., *supra*.

(7) The master's right to suspend or dismiss the employee. Copinger & Skone James, *supra*.

■■■ In addition to the elements mentioned above, the following factors indicate an absence of an employment for hire:

(1) The fact that the work was created as a special job assignment, that is, outside the scope of the employee's regular duties. Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 115 F.Supp. 754 (S.D.N.Y.1953), rev'd on other grounds, 221 F.2d 569 (2d Cir. 1955), modified on other grounds, 223 F.2d 252 (2d Cir. 1955); Eliscu v. T. B. Harms Co., 151 U.S.P.Q. 603 (N.Y.Sup.Ct., N.Y. County 1966); Ringer, *supra*, at 538.

(2) The fact that the author received no compensation until the entire work

was completed. Olympia Press v. Lancer Books, Inc., *supra*.

■ The resolution of this case and the renewal copyright claims gets down to an issue of the intention of the parties. This must be adjudicated after a lapse of 37 years from the time of the operative events. Most of the people who dealt with the matter contemporaneously are dead and the memories of interested witnesses in their recital of the past have undeniably dimmed, lapsed or been constructed. The objective manifestations, the acts, writings and contemporaneous claims of the parties and the reasonable inferences therefrom, measured against the probabilities, provide a more reliable index to the truth than mustered recollections on each side of the case, understandably schooled for the trial.

■ The inference which the Court draws from the credible evidence which does not bear the infirmity of lapsed memory or wisdom or desire born or created 37 years after the event, is that during the summer of 1933, Berlin obtained the assistance of Miss Ronell for its desire to publish an adaptation and arrangement of the vocal music and lyrics in "Three Little Pigs" for use as a popular song, utilizing the theme words of the source material as the title, "Who's Afraid of the Big Bad Wolf?"

Ann Ronell did not participate in the composition of any of the music or lyrics contained in the Disney copyrighted motion picture musical cartoon—"Three Little Pigs". The music used in the song was actually taken from the music in the picture but placed in different positions; the basic music in the song is not different; moreover, it is identical as to key, harmony and time; it is melodically, harmonically and rythmically the same. Miss Ronell did not add anything creative, original or substantial to the Disney source material of the song; there is a virtual musical identity between the musical source material and lyrics and the piano song and the latter represents no musical contribution over the former.

Miss Ronell conveyed and intended to convey her contribution to the adaptation and arrangement of the original material together with the additional words she supplied, and all her rights, including copyrightable interest, original and renewal, in the song, in exchange for a share of all royalties to Disney from copyrights, original and renewal, as well as any royalties accruing thereafter.

Defendant filed claims to copyright in its name and received certificates of registration as follows:

Class E, unp., No. 76052 dated September 8, 1933; and

Class E, pub., No. 37954, dated September 22, 1933,

with notation reading as follows:

"Words and Music by Frank E. Churchill and Ann Ronell".

During the 28th year of the original term of copyright both parties registered claims to renewal copyright of both the unpublished and published copyrights of the song. Defendant registered such renewal claims as proprietor of a work made for hire, as follows: "Words and Music by Frank E. Churchill and Ann Ronell".

The Court does not credit the claim made on the trial that in 1933 Miss Ronell also sought a so-called SPA (Songwriter's Protective Association) contract for her services on the Disney song. The force of a claim to that effect was to seek to carve out of the transfer to Disney the renewal rights to her own additions. Her only discontent during the original 28 year copyright period was with the percentage of royalty given to her (she testified that she expected one-third and got only one-fourth) and the contraction of the original legend expressing artistic credits on the song sheet. Miss Ronell sought and expected only money and credits—not copyrights or renewal privileges. She was not a weak negotiator for her own interests. She never indicated a claim to an ownership in the popular song or its copyright or in any renewal copyright until about 1960. She knew that Berlin was the

music publisher and had immediately copyrighted the song. Berlin had not sought or obtained any authorization in respect of the copyright or the publication of the song from Miss Ronell. It would have been normal to seek and obtain or supply such authorization if warranted by the facts known to both parties. Nonetheless, Miss Ronell never claimed that she had any interest in the work, its copyrights or the publication of the song, except to obtain the royalties agreed upon in 1933 and except to be given public recognition (plaudits) in the form set out in the original credits. She did not broaden her claims even when the popular song was a great success. Nearly three decades later, she hit upon the ideas which gave rise to this suit and the filing of claims to the last year of the original copyright and to the renewal copyright.

On the other hand, Disney contemporaneously described itself in the assignment of ownership and copyrights to Berlin as the sole composer and warranted to Berlin that there were no arrangements affecting copyrights or renewals thereof. Both Disney and Berlin were sensitive and sophisticated on the need to procure an assignment of copyright interests before proceeding with publication except where no factual situation existed for a claim of retained ownership or an interest therein by a writer, adapter or arranger.

In 1960, Ann Ronell's contribution to the adaptation of the cartoon song and the added lyrics were worthless without the source material. It is for these items which Ann Ronell delivered in 1933 that she was given the substantial percentage of the on-going royalty income, payable during the original and renewal copyright periods and beyond.

■ The Court has been unable to find any merit in the claim for renewal rights regardless of the rubric applied. I cannot see any room to doubt that when Miss Ronell finished her work on the source material and handed over the

product and had it reviewed and revised by Berlin's music editor and arranger and it was sent on to Disney, that it was intended to become Disney's property exclusively. The creative spark emanated from the original work. Nothing materially new was added. The additions were too insubstantial to induce an owner to share its copyrights or their ownership or do more than pay fair compensation for the services rendered which was here cast in terms of the royalty income returned.

Plaintiff, Picture Music, Inc. is a New York corporation engaged in the music publishing business. Defendant, Bonnie Bourne, is the successor to the dissolved New York corporation, Bourne, Inc., formerly Irving Berlin, Inc., an individual proprietor engaged in the music publishing business under the name of Bourne Co.

The Court concludes that jurisdiction is founded on the Copyright Act, Title 17, U.S.C., Sections 1 and 101, and Title 28, U.S.C., Section 1338. The composition entitled "Who's Afraid of the Big Bad Wolf?" was an original work subject to copyright protection under the copyright laws of the United States and all laws relating to copyright protection were duly complied with. The work done by Miss Ronell, for which Disney paid Miss Ronell, belonged—by intent of the parties as well as by operation of law—to Disney who thereafter assigned it to defendant's predecessor in title.

Defendant is entitled to judgment herein: dismissing the complaint, for injunctive relief and to an accounting from plaintiff, together with appropriate costs and reasonable counsel fees.

The foregoing shall constitute the findings and conclusions required by Rule 52(a), Fed.R.Civ.P.

An appropriate decree accordingly should be submitted on notice returnable within 20 days after the date of this decision.

*So ordered.*